Richard M. NIXON, Plaintiff,

v.

Arthur F. SAMPSON et al., Defendants,

Henry S. Ruth, Special Prosecutor,
Intervenor,

Jack Anderson, Intervenor.

The REPORTERS COMMITTEE FOR
FREEDOM OF the PRESS et al.,
Plaintiffs,

v.

Arthur F. SAMPSON et al.,
Defendants,

Richard M. Nixon, Intervenor.

Lillian HELLMAN et al., Plaintiffs,

v.

Arthur F. SAMPSON et al.,
Defendants,

Sen. Sam J. Ervin, Jr., et al.,
Amici Curiae;

Congresswoman Elizabeth Holtzman,
Amicus Curiae.

Civ. A. Nos. 74–1518, 74–1533,
and 74–1551.

United States District Court,
District of Columbia.

Jan. 31, 1975.

112

Herbert J. Miller, Jr., R. Stan Morten-
son, Raymond G. Larroca, William H.

Jeffress, Jr., Miller, Cassidy, Larroca & Lewin, Washington, D. C., for Richard M. Nixon.

Peter M. Kreindler, Counsel to the Sp. Prosecutor, Richard Davis; Kenneth S. Geller, Asst. Sp. Prosecutors, Watergate Sp. Prosecution Force, Washington, D. C., for the Special Prosecutor.

William A. Dobrovir, Andra N. Oakes, Washington, D. C., for Jack Anderson.

Carla A. Hills, Asst. Atty. Gen., Irving Jaffe, Deputy Asst. Atty. Gen., Irwin Goldbloom, Acting Deputy Asst. Atty. Gen., Jeffrey Axelrad, Dept. of Justice, Earl J. Silbert, U. S. Atty., Washington, D. C., for Arthur F. Sampson, et al.

Robert E. Herzstein, Mark J. Spooner, Andrew S. Krulwich, Jonathan D. Schiller, Leonard Simon, Arnold & Porter, Washington, D. C., for The Reporters Committee for Freedom of the Press et al.; David Bonderman, Lawrence C. Maisel, Thomas B. Wilner, Ivor C. Armistead, III, Washington, D. C., Peter T. Grossi, Jr., New Haven, Conn., of counsel.

Leon Friedman, Hofstra University School of Law, Hempstead, N. Y., John H. F. Shattuck, Melvin L. Wulf, American Civil Liberties Union, Telford Taylor, Columbia University Law School, New York City, for Lillian Hellman et al.

Thaddeus Holt, Breed, Abbott & Morgan, and William Sudow, Counsel, Subcommittee on Printing of the House Administration Committee, Washington, D. C., for amici curiae Senator Sam J. Ervin, Jr., et al.

Larry P. Ellsworth, Alan B. Morrison, Washington, D. C., for amicus curiae Congresswoman Elizabeth Holtzman.

## MEMORANDUM OPINION

CHARLES R. RICHEY, District Judge.

### I. INTRODUCTION

These consolidated cases present a unique controversy, the heart of which concerns the ownership of and the right to assert or waive privilege with respect to the "Presidential materials and tape-recorded conversations"[1] of the Nixon Administration.

The suits comprise the following actions: a suit by former President Richard M. Nixon (C.A. No. 74–1518) for injunctive relief and a writ of mandamus against Arthur F. Sampson, the Administrator of General Services; Philip W. Buchen, counsel to President Gerald R. Ford; and H. Stuart Knight, Director of the Secret Service, as well as the Special Prosecutor, an intervenor-defendant, who has counterclaimed against Mr. Nixon for declaratory relief; a suit by The Reporters Committee for Freedom of the Press, et al. (C.A. No. 74–1533) for declaratory and injunctive relief against Messrs. Sampson, Buchen, and Knight; a suit by Lillian Hellman, et al. (C.A. No. 74–1551) for declaratory and injunctive relief against Mr. Richard M. Nixon and Messrs. Sampson, Buchen, and Knight; and a suit by Mr. Jack Anderson, an intervenor-plaintiff in C.A. No. 74–1518, for declaratory and injunctive relief against Mr. Nixon, by cross-claim, and against Messrs. Sampson, Buchen, and Knight for declaratory and injunctive relief.

These actions are before the Court on the following motions:[2] plaintiff Nixon's motion for a preliminary injunc-

---

1. The nature of the "Presidential materials and tape-recorded conversations" will be discussed *infra*. However, prior to that discussion, the term should be considered as including all of the materials, including documents, papers, etc., and tape-recorded conversations of the Nixon Administration which have been boxed or set aside by personnel of the General Services Administra-

tion and the archivists assigned to the White House.

2. These consolidated cases were before the Court on motions for preliminary injunction by plaintiffs Nixon, Anderson, and The Reporters Committee for Freedom of the Press, et al., the joint motion of the Special Prosecutor and the government defendants

tion; plaintiff Nixon's motions to dismiss the Hellman, et al., and Anderson suits for lack of standing; the government defendant's motion to dismiss all the actions, except that by the Special Prosecutor, on the ground that they are moot; and on motions for summary judgment or partial summary judgment by plaintiffs Anderson, The Reporters Committee for Freedom of the Press, et al., Lillian Hellman, et al., and the Special Prosecutor, on his counterclaim for declaratory relief, and as the intervenor-defendant in C.A. 74–1518.

## II. BACKGROUND [3]

On August 9, 1974, President Richard M. Nixon resigned from Office and was succeeded by Gerald R. Ford.[4] Shortly thereafter, on August 15, 1974, members of the Office of the Special Prosecutor [5] informed Philip W. Buchen,[6] counsel to President Ford, and J. Fred Buzhardt, counsel to former President Nixon, that the Special Prosecutor had a continuing interest in the Presidential materials

and tape-recorded conversations of the Nixon Administration which are housed in the White House, the Executive Office Building, and elsewhere, that "might be relevant to investigations and prosecutions within the jurisdiction of the Special Prosecutor."[7] Assurances were given to the Special Prosecutor that the files of former President Nixon and his staff members would not be removed from the White House or the Executive Office Building without the Special Prosecutor's approval.[8] On August 22, 1974, Mr. Buchen requested an opinion from Attorney General William Saxbe on the issues of the ownership of the Presidential materials and tape-recorded conversations of the Nixon Administration and the responsibilities of the Ford Administration with respect to subpoenas or other court orders requiring the production of these materials and/or tape-recorded conversations.[9] On August 29, 1974, Mr. Buchen received a preliminary opinion from Deputy Attorney General Laurence Silberman

---

for modification of the temporary restraining order, and plaintiff Nixon's motions to dismiss the Anderson and Hellman complaints for lack of standing. Subsequent to the hearings on these motions, the Congress passed and President Ford signed the Presidential Recordings and Materials Preservation Act, see footnote 36, infra, which changed the posture of this litigation, see Section V, infra. The parties therefore filed appropriate motions for a resolution of the questions extant. The Court will, therefore, of even date herewith, deny the motions for a preliminary injunction of plaintiffs Anderson and The Reporters Committee for Freedom of the Press, et al. However, the motions by plaintiff Nixon to dismiss are still viable and require resolution. Further, the joint motion of the Special Prosecutor for modification of the temporary restraining order will be considered, as requested by the Special Prosecutor, as being merged into his motion for summary judgment.

3. The facts contained in this section are not all-inclusive, but form the essential background of this litigation. They are not in dispute. Further facts will be included in the later appropriate sections.

4. President Richard M. Nixon resigned from office shortly after a unanimous recommendation by the House Committee on the Judi-

ciary that he be impeached. Impeachment of Richard M. Nixon, President of the United States, H.R.Rep.No.93–1305, 93d Cong., 2d Sess. (1974). Gerald R. Ford became the 38th President on August 9, 1974.

5. On May 25, 1973, the Attorney General of the United States established the Office of the Special Prosecutor. Department of Justice Order No. 517–73, 38 Fed.Reg. 14,688, adding 28 C.F.R. §§ 0.37, 0.38 and appendix to subpart G–1 (June 4, 1973). The Special Prosecutor, Mr. Leon Jaworski, was the original named intervenor. Since he resigned the office and was replaced by Mr. Henry S. Ruth, Jr., Mr. Ruth has been substituted as the named intervenor pursuant to Rule 25(d)(1) of the Federal Rules of Civil Procedure.

6. Mr. Buchen is a named defendant in all the consolidated actions.

7. Affidavit of Peter M. Kreindler, counsel to the Special Prosecutor, at ¶ 3 (hereinafter, "Kreindler affidavit"); Deposition of Philip W. Buchen, November 11, 1974, pp. I–4, 5, II–10, 6 (hereinafter, "Buchen deposition").

8. Kreindler affidavit at ¶ 3. Buchen deposition at II–73.

9. Buchen deposition at I–7. See footnote 87, infra.

that the Presidential materials and tape-recorded conversations were to be regarded as belonging to the former President, but that the government had a right to use the materials for ongoing governmental purposes and would also have to respond to subpoenas or court orders relating to the materials and tape-recorded conversations.[10] Thereafter, Mr. Buchen met with Mr. William Casselman, counsel to President Ford, and Mr. Benton L. Becker, a private attorney, concerning the disposition of the Presidential materials of the Nixon Administration.[11] On or about August 30, 1974, Mr. Buchen contacted Mr. Herbert J. Miller, attorney for former President Nixon, and raised the subject of the disposition of the materials.[12] Further discussions were held on September 3 and September 5, 1974, between Mr. Buchen, Mr. Miller and Mr. Becker.[13] At the September 5 meeting, Mr. Miller presented a draft depository agreement for consideration.[14] After some changes, it was finalized and signed by the former President on September 6, 1974.[15] On the same day, a written opinion of Attorney General Saxbe was released.[16] At or about 6:15 or 6:30 p. m. on September 7, 1974, Mr. Arthur F. Sampson, Administrator of the General Services Administration, met with Messrs. Casselman and Becker, who presented him with the depository agreement signed by former President Nixon.[17] At approximately 7:10 p.m., Mr. Sampson signed the agreement,[18] (hereinafter, the "Nixon-Sampson Agreement").

On September 10, 1974, Jack Anderson, a well-known newspaper columnist, filed an application with the General Services Administration, pursuant to the Freedom of Information Act,[19] seeking access to the materials encompassed by the Nixon-Sampson Agreement. On October 2, 1974, Lillian Hellman and other members of the Committee for Public Justice filed a similar application, but restricted it to the tape recordings of conversations in the White House and Executive Office Building. Both applications were denied on the grounds that:

. . . (1) this agency does not presently have the requested materials in its possession; (2) deposited papers and other historical materials are not "records" within the purview of the Freedom of Information Act and, therefore, are not subject to its provisions; and (3) assuming, for the sake of argument, that the deposited papers and other historical materials are subject to the provisions of the Act, they are exempt from disclosure under the third exception to the mandatory public disclosure; i.e. " . . . matters that are . . . specifically exempted from disclosure by statute . . ." 5 U.S.C. 552(b)(3)). The pertinent statute is the Presidential Libraries Act of 1955, which provides that the Administrator of the General Services may accept for deposit on behalf of the United States papers and/or other historical materials which may be subject to restrictions upon access that have been accepted by the Administrator (44 U.S. 2107–2108).[20]

---

10. *Id.* at I–11, 12.

11. Deposition of Benton L. Becker at 12 (hereinafter, "Becker deposition").

12. Buchen deposition at I–14, 15, 16.

13. Becker deposition at 28–29; Buchen deposition, Exhibit 4.

14. Buchen deposition, Exhibits 4 & 5; Becker deposition at 35; Buchen deposition at II–46.

15. Deposition of Arthur F. Sampson at 13, 85 (hereinafter, "Sampson deposition"); Becker deposition at 51, 103.

16. Sampson deposition at 20, 22–23.

17. Kreindler affidavit at ¶ 5.

18. The Nixon-Sampson agreement is set forth in Appendix A.

19. 5 U.S.C. § 552 (1970).

20. Letter of Mr. Richard Q. Vawter, Director of Information, GSA, to Mr. Jack Anderson, dated October 3, 1974, at ¶ 3.

Thereafter, the applicants exhausted their administrative remedies.[21]

On October 17, 1974, former President Nixon brought suit against Arthur F. Sampson, Philip W. Buchen, and H. Stuart Knight,[22] seeking a temporary restraining order and a preliminary injunction to compel compliance with the Nixon-Sampson Agreement and preventing unauthorized access to the materials and tape-recorded conversation. On October 21, 1974, Jack Anderson, whose application for access to the materials had been denied on the basis, *inter alia*, of the Nixon-Sampson Agreement, moved to intervene, seeking temporary and preliminary injunctive relief to prevent its implementation. On the same day, the Special Prosecutor also moved to intervene in order to protect the interests of his office in the materials and tape-recorded conversations. Also on October 21, The Reporters Committee for Freedom of the Press, et al., filed suit against the government seeking relief similar to that sought by plaintiff-intervenor Anderson in C.A. 74–1518, as well as consolidation with the Nixon suit. After granting the Reporters' motion to consolidate, the Court held a hearing. On October 21, the Court, in order to preserve the status quo, issued a temporary restraining order which essentially prohibited the implementation of the Nixon-Sampson Agreement and set forth the access procedures to the materials until a full hearing on the mo-

tions for a preliminary injunction could be held.

On October 24, 1974, Lillian Hellman, and other members of the Committee for Public Justice, whose application for access had been denied, brought suit against the government and former President Nixon for declaratory and injunctive relief, seeking access to specified tape recordings.[23] The Hellman plaintiffs also moved to consolidate their action with the other suits.

During this time period, several members of Congress who had introduced and supported legislation concerning the Nixon-Sampson Agreement moved for leave to appear as amici curiae,[24] and the Court granted their motions.

On October 25, former President Nixon moved to amend the temporary restraining order, claiming that there was an immediate need for the original materials and tape-recorded conversations to enable him to testify in the Watergate criminal trial. The Court scheduled a hearing on the matter for October 30. In the interim, Mr. Nixon moved to consolidate the hearing on the preliminary injunction with the trial, to intervene in the Reporters' suit, and to amend his application for a preliminary injunction, in order to request immediate transfer to his possession of all the materials and tape-recorded conversations. The Reporters Committee for Freedom of the Press, et al., also moved to extend the temporary restraining or-

21. Plaintiff Anderson filed an administrative appeal on October 8, 1974. While no action has been taken, counsel for the government defendants have stipulated that Anderson's request, as well as those of Lillian Hellman, et al., and The Reporters Committee for Freedom of the Press, et al., would be denied on the same grounds set forth in the accompanying text of this footnote, and that their administrative remedies should be deemed exhausted. Transcript of the Hearing of November 18, 1974, pp. 405–407.

22. The suit names the defendants in their official capacity as officers of the United States government, as well as individually. Therefore, the suit must be considered, insofar as it concerns the action of the defendants in their official capacity, as one against

the United States. *See* Dugan v. Rank, 372 U.S. 609, 620, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963).

23. Plaintiffs Hellman, et al., made application for access to the 147 tape-recorded conversations subpoenaed by the House Committee on the Judiciary during the hearings on the question of the impeachment of the President. *See* footnote 21, *supra.*

24. Congresswoman Elizabeth Holtzman filed a motion to appear as amicus curiae which was granted on November 11, 1974. On November 11, five other members petitioned to appear as amici curiae; specifically, Sam J. Ervin, Jr., John Brademas, Jacob Javits, Gaylord Nelson, and Wayne Hays. This motion was also granted on November 11, 1974.

der. After the hearing, during which Mr. Nixon's counsel withdrew his motion to modify the temporary restraining order because the former President was too ill to testify, the Court, on October 31, granted the Special Prosecutor's and Anderson's motions to intervene in the Nixon suit, granted Nixon's motion to intervene in the Reporters' suit, consolidated the Hellman suit with the Nixon and Reporters Committee suits, extended the temporary restraining order, and denied the motion to consolidate the trial with the hearing on the motions for preliminary injunctions, which was set for November 15, 1974.

On November 4, the Anderson, Hellman and Reporters plaintiffs (hereinafter, the "FOIA plaintiffs"), moved to take depositions and to inspect the areas where the materials were being kept. In order to provide the parties with the opportunity to make an adequate record at the subsequent hearing, the Court allowed limited depositions and also ordered the government to provide the Court and the parties with a descriptive categorization of the materials. On the same day, Mr. Nixon again moved to amend the temporary restraining order, which motion in essence sought a clarification of the access procedures.

On November 11, the Special Prosecutor and the government filed a joint motion to amend the temporary restraining order to allow implementation of an agreement dated November 9, 1974,[25] between President Ford and the Special Prosecutor which provided, *inter alia,* that the President had determined that in the interest of justice the Special Prosecutor would have immediate access to the Presidential materials and tape-recorded conversations of the Nixon Administration for purposes of investigation and prosecution of persons involved in the "Watergate" matter. Shortly thereafter, on November 13, former President Nixon filed a new motion for a temporary restraining order requesting that the Ford-Ruth Agreement be enjoined.[26]

After two days of hearings on all motions extant, on November 15 and 18, the Court requested that the parties file proposed findings of fact and conclusions of law by November 29, 1974. At the request of the parties, this was extended to December 6. A few days later, on December 9, the Congress passed a bill relating to the materials covered by the Nixon-Sampson Agreement.[27] The Court promptly ordered that the parties brief the impact of this legislation. Those briefs were filed on December 16, 1974. On December 19, 1974, President Gerald R. Ford signed into law the Presidential Recordings and Materials Preservation Act.[28] In response thereto, considering the posture of the cases to have been altered by the new legislation, the parties filed the following motions: the government defendants moved to dismiss all actions, except the Special Prosecutor's counterclaim, on the ground that they have become moot; the Special Prosecutor filed a motion for summary judgment; and plaintiffs Anderson, Reporters Committee for Freedom of the Press, et al., and Lillian Hellman, et al., have filed motions for summary judgment or, in the alternative, for partial summary judgment.

### III. THE CLAIMS OF THE PARTIES

Former President Nixon, who claims ownership to the Presidential materials and tape recordings generated or retained during his tenure in office, seeks a writ of mandamus or an injunction in the nature of specific performance to compel the defendants, officers of the United States, to comply with the terms and conditions of the Nixon-Sampson

---

25. Hereinafter, the "November 9th Agreement". The full text of the agreement is set forth in Appendix B.

26. This motion was subsequently withdrawn.

27. 120 Cong.Rec. H. 11442, S. 20806 (daily ed., Dec. 9, 1974).

28. *See* footnote 36, *infra.*

Agreement, including but not limited to immediately transferring the materials to California, except (a) such materials and tapes as were subject to subpoena or other legal process at the time the action was filed and, (b) such of the materials and tapes which the Special Prosecutor may designate which are needed for ongoing criminal investigations and prosecutions, provided that such excepted materials and tapes, or portions thereof, shall be transferred in accordance with the agreement at such time as such subpoenas or court orders are quashed, vacated or satisfied, and the Special Prosecutor no longer has such interest in them. Further, he requests that the defendants be enjoined from interfering with the performance of the agreement and that they be enjoined from having access to the materials and tapes without his authorization. The gravamen of the former President's claim is that he has a constitutional right and duty to protect and assert the privilege of confidentiality which allegedly attaches to the Presidential materials and tapes, and that ownership and control of the materials and tapes is an essential incident of this right and duty. It is also his contention that compliance by the defendants with demands for production of the materials and tapes will necessitate a search of the materials and tapes which, without his authorization, will be in derrogation of rights and privileges afforded the former President by the Constitution. Thus, he maintains that the November 9th Agreement between President Ford and the Special Prosecutor is unlawful as it abridges his rights and duty to protect the privilege of confidentiality as well as other of his constitutional rights, particularly the right to be free from unreasonable searches and seizures. And, lastly, the former President claims that the defendants, having entered into the Nixon-Sampson Agreement, owe him a duty to comply with the terms and conditions of the agreement, which he asserts is valid, binding and non-discretionary. It is on the basis of all of the above that he seeks equitable relief, stating that he has no adequate remedy at law and that he will suffer irreparable injury without preliminary and permanent relief.

It is the contention of the Special Prosecutor, an intervenor-defendant in the Nixon suit, and in which contention the government concurs, that the government of the United States and the Special Prosecutor, by virtue of its authorization and responsibilities, have an "overriding interest" in the Presidential materials and tapes of the Nixon Administration which supervenes any personal or contractual rights that the former President may or may not have. The Special Prosecutor also claims that this interest was recognized by the government prior to the Nixon-Sampson Agreement and that the government, by entering into the agreement, did not intend to negate this "overriding interest", nor does the agreement itself. Furthermore, the Special Prosecutor maintains that the former President does not have the constitutional right to assert a claim of privilege against his successor in office who, it is claimed, has determined by the November 9, 1974 Agreement, that the interests of justice require that the Special Prosecutor have access to the materials and tapes.

While concurring with the Special Prosecutor in his contentions, the government does not contest the validity of the agreement, nor the right of ownership asserted by the former President in the materials and tapes. Nevertheless, it is the position of the defendants that the relief requested by the former President is barred by the doctrine of sovereign immunity, in that specific performance will not lie against the government for failure to comply with a contract. They also argue that since the Nixon-Sampson Agreement is silent as to when and how the agreement is to be effectuated, it is discretionary and not ministerial and, therefore, a writ of mandamus may not issue. Finally, the defendants contend that any search of the materials or tapes will not violate Mr. Nixon's fourth amendment rights.

The contentions of Jack Anderson, The Reporters Committee for Freedom of the Press, et al., and Lillian Hellman, et al., the "FOIA plaintiffs", are essentially identical. Having been denied access to the Presidential materials and tapes on the basis of the Nixon-Sampson Agreement, they seek an injunction restraining the effectuation of the agreement and a declaration that the Presidential materials and tapes belong to the United States, and not to the former President. They claim that the Presidential materials and tapes are government records, that since the former President was a private citizen at the time he entered into the Nixon-Sampson Agreement, he could not impose restrictions on access to the materials, and that it was beyond the statutory authority of the Administrator to allow any such restrictions to be imposed. In support of this proposition, they argue that any historical practice of claims of ownership by prior Presidents was terminated by the Presidential Libraries Act, 44 U.S.C. § 2101 et seq., and that a former President does not have the right to claim Presidential privilege. Furthermore, they maintain that Arthur F. Sampson, the Administrator of General Services, failed to comply with statutory requirements when he signed the agreement and, therefore, it is null and void. Specifically, they allege that Mr. Sampson failed to perform his statutory duty to negotiate an agreement,[29] and also failed to confer with the National Records Council prior to signing the agreement, which they contend is also statutorily required. Furthermore, they argue that the Nixon-Sampson Agreement is invalid because it allegedly confers title to the materials and tapes upon the former President, in contravention of the exclusive power of Congress to dispose of property under Article 4 of the Constitution. They also contend that these materials and records, etc., are an emolument within the meaning of and in violation of Article II of the Constitution. In addition, they allege that the agreement is merely temporary and that there is no assurance that the former President will permanently donate the materials or even some of the materials to the United States; therefore, if an injunction does not issue, the possibility of their attaining their right of access to the materials will be forever lost. Lastly, they maintain that access to the materials and tape-recorded conversations cannot be barred by a claim of privilege by the former President; it is their position that the privilege belongs to the government and may only be asserted by the incumbent President.

## IV. JURISDICTION

The jurisdiction of the Court in Civil Action No. 74–1518 is founded upon Title 28 U.S.C. §§ 1331, 1332, 1361 and in Civil Action Nos. 74–1533 and 74–1551 upon Title 5 U.S.C. §§ 552, 702–704 and Title 28 U.S.C. §§ 1331, 1361.

## V. STANDING

Former President Nixon and the United States have, by motion [30] and in all their papers [31] and oral argument, vigorously contested the standing to sue of intervenor-plaintiff Anderson, The Reporters Committee for Freedom of the Press, et al., and Lillian Hellman, et al. The argument is basically three-fold. First, it is claimed that these parties have only a speculative interest in the materials and have not sustained an "injury in fact". Second, it is argued that the Freedom of Information Act does not provide a basis for challenging the validity of the Nixon-Sampson Agreement. Encompassed within this contention are the assertions that: the

---

29. *See* 44 U.S.C. § 2108(c).

30. Plaintiff Nixon has moved to dismiss Plaintiff Anderson's crossclaim in C.A. 74–1518 and, as a named defendant in C.A. 74–1551, moved to dismiss the complaint of Lillian Hellman, et al.

31. The government defendants have contested the standing of the FOIA plaintiffs in ther opposition to the motions for a preliminary injunction.

materials are not agency "records"; the White House is not an "agency"; the materials are "exempted" from disclosure under the FOIA; and the Congress does not have the constitutional power to require disclosure of Presidential materials and tape-recorded conversations.[32]

In support of these contentions, former President Nixon and the United States have placed great reliance upon the Tenth Circuit opinion in Nichols v. United States, 460 F.2d 671 (10th Cir. 1972), aff'g 325 F.Supp. 130 (D.Kan. 1971), for the proposition that since those persons who here seek access to the materials and tape-recorded conversations were not parties to the Nixon-Sampson Agreement nor have a claim of ownership in the materials and tape-recorded conversations, they therefore do not have standing to contest the validity or terms of the agreement.

In Nichols, a pathologist had been denied access to certain materials relating to the assassination of President John F. Kennedy. He claimed in federal court that the donation agreement between the Kennedy estate and the government was a nullity since the government had possession of the materials prior to the donation and, therefore, they were government property. The trial court held that a donor need not "own" the materials to deposit them pursuant to 44 U.S.C. §§ 2107, 2108(c), and to place restrictions on their access, as long as the materials "fall within the description of those things which may be deposited." 325 F.Supp. at 136. The Tenth Circuit upheld the ruling of the trial court and added that since Nichols was not a party to the agreement, he did not have standing to contest its validity or terms. 460 F.2d at 674–675.

The arguments of former President Nixon and the government, however, do not really address the question of standing but, rather, go to the merits of the FOIA plaintiffs' claims.

And, the opinions in Nichols, supra, are likewise infirm and should not be followed. It must be recognized that the judicial doctrine of standing is simply a correlative of the Article III requirement of the Constitution that there be a "case or controversy". See Flast v. Cohen, 392 U.S. 83, 101, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1953). The essence of this requirement is that a federal court will not serve as a "forum in which to air . . . generalized grievances about the conduct of government." Id. at 106, 88 S.Ct. at 1956. Thus, it is necessary that there be an impact on the party which is not common to all members of the public. Laird v. Tatum, 408 U.S. 1, 13, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). The courts, therefore, have established certain criteria which must be met in order for there to be "a personal stake in the outcome of the controversy as to assure that concrete adverseness . . . upon which the court so largely depends for the illumination of difficult constitutional questions." Baker v. Carr, 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1969). Congress, however, has determined that these criteria need not be demonstrated in certain cases. These actions, under the Freedom of Information Act, present such a case.

The primary purpose of the Freedom of Information Act,[33] passed in 1966, is to increase public access to government records, Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1076 (1971), by providing a right of access to "any person" without "consideration of the interests of the party seeking relief." Id. at 1077. The FOIA, therefore, clearly effectuates important first amendment interests. See Tennessean Newspapers, Inc. v. Federal Housing Administration, 464 F.2d 657, 660 (6th Cir. 1972). Upon a denial of access, the applicant may bring a suit in the United States District Court and there obtain a de novo determination of the matter.[34]

---

32. See footnote 20, supra.

33. 5 U.S.C. § 552 (1970).

34. The FOIA plaintiffs have not only sought a de novo determination of the matter, but have also requested a declaratory judgment

5 U.S.C. § 552(a)(3). Thus, when access is denied, a controversy exists and injury must be presumed. To then require that the person meet the criteria for standing would be in contravention of the Act. Moreover, the "burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(3). Thus, it is impermissible to require the person who has been denied access to prove his case at the outset, as the government and the former President seek to require the FOIA plaintiffs to do.

■ Simply stated, when a party, such as the parties in the instant matter, has made an application under the FOIA and that application has been denied, (s)he has standing to sue in the federal courts. And, questions as to whether that which is sought is a "record" within the meaning of the FOIA; whether a claimed exemption is valid, and other such questions go to the merits of the action, for which the plaintiff is entitled to a *de novo* determination. Thus, the opinions in *Nichols, supra,* to the extent that they held that the plaintiff therein, an FOIA applicant, did not have standing, appear to be in error.

Notably, in *Nichols,* the trial court rejected the plaintiff's claim that the material requested belonged to the government, or was a government "record" within the FOIA, and granted the government's motion for summary judgment. 325 F.Supp. at 137, 138. The Tenth Circuit upheld the district court, but added, as dictum, that it believed that the plaintiff had no standing. 460 F.2d at 674–675. It is apparent to this Court, however, that an FOIA plaintiff, such as Nichols, has standing, even though (s)he may not prevail on the merits.

■■ For similar reasons, the contention that the FOIA plaintiffs do not

have standing to contest the validity of the Nixon-Sampson Agreement is also untenable. It is well settled that the exceptions of the Freedom of Information Act are to be read narrowly and that disclosure is the rule, not the exception. And, Section 552(a)(3) of the Act places the burden on the government to sustain its action. Thus, the courts have been loathe to accept mere assertions that a record is covered by an exception. The former President and the government, however, point to the *Nichols* case, *supra,* and the recent Supreme Court decision in Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973), for the proposition that the parties herein, who have been denied access to records because of the Nixon-Sampson Agreement, may not challenge the validity of the agreement.

The *Mink* case does not stand for such a proposition. The Supreme Court in *Mink* delineated the parameters of judicial review of a denial of access under the national defense and foreign policy exemption, 5 U.S.C. § 552(b)(1). The court held that once a record had in fact been classified, the district court, after the government has shown that the President has determined to keep a record secret, should not inquire into the "soundness of executive classifications. . . ." 410 U.S. at 84, 93 S.Ct. 827. The *Mink* decision, however, cannot be read to hold that the soundness of the assertions under all of the exemptions should not be scrutinized. And, notably, this Circuit has opined that the *Mink* decision does not preclude in inquiry into whether a document has *in fact* been classified. *See* Schaffer v. Kissinger, 505 F.2d 389 (D.C.Cir., 1974).

The government in these cases has denied access to the materials under the

---

pursuant to 28 U.S.C. §§ 2201, 2202, that the "Presidential materials and tape-recorded conversations" do not belong to former President Nixon but, rather, to the United States and are "records" within the meaning of the FOIA, and that the Nixon-Sampson Agreement is invalid. Such a remedy is

clearly available in connection with a FOIA suit, even though some of the applications did not request *all* of the materials and tape-recorded conversations. *See* Renegotiation Board v. Bannercraft Clothing Co., 415 U.S. 1, 94 S.Ct. 1028, 39 L.Ed.2d 123 (1974).

third exemption of the Freedom of Information Act, 5 U.S.C. § 552(b)(3), which provides that this section does not apply to matters that are "specifically exempted from disclosure by statute." The statute that is asserted is the Presidential Libraries Act, 44 U.S.C. § 2101 et seq. The government claims that the parties do not have standing to challenge the Nixon-Sampson Agreement, as there is a statute which specifically exempts from access the materials encompassed by the agreement. It is the government's contention, in which the former President concurs, that this is dispositive of the matter. · This, however, is not the law.

■ The exemptions under the Freedom of Information Act are to be narrowly construed. This general construction of the FOIA has been made particularly applicable to the third exemption. Robertson v. Butterfield, 498 F.2d 1031 (D.C.Cir. 1974). A court must not only examine and interpret the statute relied upon as specifically exempting disclosure. *See* Schechter v. Weinberger, 506 F.2d 1275 (D.C.Cir. 1974). It must also resolve any dispute as to whether the exemption has been properly invoked. *See* Stretch v. Weinberger, 3 Cir., 495 F.2d 639 (1974).

■ Thus, it is the conclusion of this Court that the Nixon-Sampson Agreement, having been invoked to bar access to the FOIA plaintiffs, can be scrutinized by this Court. For, if the FOIA plaintiffs are correct in their allegations that these are government "records" within the meaning of the FOIA and do not belong to the former President, and that the Nixon-Sampson Agreement is invalid, it would do great violence to the letter and spirit of the FOIA to hold that the government, by merely asserting the third exemption, could preclude a determination of these issues and thus access which would otherwise be appropriate. And, to the extent that *Nichols, supra,* is contrary, it is rejected.[35]

## VI. JUSTICIABILITY

A threshold issue in these consolidated cases is whether they remain justiciable. Subsequent to the commencement of these proceedings, Congress passed and President Ford signed into law the Presidential Recordings and Materials Preservation Act.[36] The Act, which is unique both as to its nature and because it is specifically directed at these pending proceedings, has raised a dispute as to whether, on the basis of the allegations extant and the possible relief that may be afforded, there still exists a "live dispute between the parties" which requires resolution. Golden v. Zwickler, 394 U.S. 103, 109, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). In this regard, the Court must ascertain whether the effect of the Act is to moot any or all of the questions presented,[37] and whether the non-mooted questions, if any, are present in an actual controversy requiring immediate resolution and for which the Court can fashion an appropriate

---

35. The Tenth Circuit's statement was not only dictum, but was based upon a finding that the material did not belong to the government. In the instant matter, the FOIA plaintiffs claim that these are government records, and there has been no contrary finding. Furthermore, it is obvious that FOIA applicants do not personally own the records that they seek. This cannot preclude access, or else all applications would be denied. The true question here, as a *Nichols,* is whether restrictions can be placed on "records" beyond those contained in the exemptions to the FOIA, 5 U.S.C. § 552(b)(1-9). In Nichols, it was found that the materials were not even records. Therefore, the court

in *Nichols* did not even have to reach this question.

36. Pub.Law 93-526, "An Act to protect and preserve tape recordings of conversations involving former President Richard M. Nixon and made during his tenure as President, and for other purposes," to be cited as the "Presidential Recordings and Materials Act." The Act, formerly S. 4016, was passed by the Congress on December 9, 1974, see Cong. Rec. 93rd Cong., 2d Sess., S. 20806, H. 11442 (daily ed., Dec. 9, 1974), and was signed by President Ford on December 19, 1974.

37. *See* Golden v. Zwickler, *supra,* 394 U.S. at 108-109, 89 S.Ct. 956.

remedy.[38] In conjunction with the latter inquiry, the Court must also determine whether the legislation makes an adjudication of any or all of the questions premature.[39]

 It is clear to the Court that the Presidential Recordings and Materials Preservation Act nullifies the Nixon-Sampson Agreement of September 7, 1974.[40] The Nixon-Sampson Agreement provided essentially that the Presidential materials and tape recordings of the Nixon Administration would be "deposited temporarily" in an existing government facility.[41] Access to the Presidential materials was to be by a two-key system, one held by the government and the other held by Mr. Nixon, as "custodian of the materials", the latter key being "essential for access." [42] Access to both the Presidential materials and tape recordings was to be limited to Mr. Nixon or any person whom he designated.[43] As to the Presidential materials, Mr. Nixon could, after three years, "withdraw from deposit without formality any or all of the materials . . . for any purpose or use . . . ." [44] And, as to the tape recordings, they were to be donated to the United States as of September 1, 1979, under specific instructions, but would be destroyed at the time of Mr. Nixon's

death or on September 1, 1984, whichever event occurred first.[45] The agreement further provided that upon any subpoena or court order which demanded that the government produce either the Presidential materials or tape recordings, the government would notify Mr. Nixon who, as "owner and custodian" with the "sole right and power of access thereto," could then raise "any privileges or defenses" he might have.[46] Mr. Nixon was to then allow the government to inspect the materials in order that "national security or any other privilege" could be interposed.[47]

Upon a careful examination of the terms and conditions of the Nixon-Sampson Agreement, it is apparent that its salient aspects are: that Mr. Nixon would be the custodian of the Presidential materials and tapes, of the latter until 1979, and of the former until such time as he donated such materials as he designated; that Mr. Nixon would have the sole right of access to both the Presidential materials and tape recordings; and that Mr. Nixon would have the sole right to use the information contained in the Presidential materials and tape recordings. Thus, it is unquestionable that the Presidential Recordings and Materials Preservation Act, which provides in Title I, Sections 101(a), (b) and 102(a) [48] that the Administrator of

---

38. *Id.* *See also* Powell v. McCormack, 395 U.S. 486, 517, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969).

39. *See* Abbott Laboratories v. Gardner, 387 U.S. 136, 148–149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967).

40. The clear intent of Congress can be ascertained by the succinct statement in the House Committee Report that "This legislation would nullify the Nixon-Sampson Agreement of September 7, 1974, and would provide that the Federal Government retain custody of the Nixon tapes and Presidential materials." Report of the Committee on House Administration No. 93–1507, 93rd Cong., 2d Sess. at 4 (Description of the Bill) (November 27, 1974) (Hereinafter, "House Committee Report").

41. *See* Appendix A, Intro. ¶ 12, ¶ No. 4.

42. *See* Appendix A, ¶ 6.

43. *See* Appendix A, ¶ 7(A) and ¶ 9(A).

44. *See* Appendix A, ¶ 7(A). Prior to expiration of the three-year period Mr. Nixon could only remove reproductions of the Presidential materials, although still for "any use". *Id.*

45. *See* Appendix A, ¶ 8. Prior to their destruction, no reproductions could be made of the tapes and no person could listen to the tapes without Mr. Nixon's prior approval. He further reserved to himself "literary use of the information on the tapes." *Id.* at ¶ 9(A).

46. *See* Appendix A, ¶ 6(B) and ¶ 9(B).

47. *Id.*

48. Title I, Sections 101(a), (b) and 102(a) provide that:
 "Sec. 101.(a) Notwithstanding any other law or any agreement or understanding made pursuant to section 2107 of title 44,

General Services shall, "Notwithstanding any other law or agreement or understanding . . . retain . . . complete possession and control . . ." of the tape recordings and Presidential materials of the Nixon Administration, and that they shall not be destroyed except as provided by law, abrogates the Nixon-Sampson Agreement.[49]

■ Although the Presidential Recordings and Materials Preservation Act moots the question of the validity of the Nixon-Sampson Agreement, the Act does not resolve the questions of ownership of the Presidential materials and tape recordings, nor whether the former President may assert any privilege in regard thereto. First, with respect to the question of ownership, the Act re-

quires that the Administrator of General Services take custody and control, but makes no statement as to who has title to the Presidential materials and tape recordings. It is apparent that Congress deliberately chose not to resolve this question. The section of the House Committee Report on private ownership unequivocally states that: "The legislation takes no position on the ownership of these materials prior to enactment of this title. The committee believes that at this time the resolution of the question of prior ownership is a matter most appropriately left for the judiciary to decide."[50] The avoidance by Congress of the question of ownership is also evidenced by title I, section 105(a) of the Act.[51] That section, while under the

United States Code, any Federal employee in possession shall deliver, and the Administrator of General Services (hereinafter in this title referred to as the 'Administrator') shall receive, obtain or retain complete possession and control of all original tape recordings of conversations which were recorded or caused to be recorded by any officer or employee of the Federal Government and which—

(1) involve former President Richard M. Nixon or other individuals who, at the time of the conversation, were employed by the Federal Government;

(2) were recorded in the White House or in the office of the President in the Executive Office Buildings located in Washington, District of Columbia; Camp David, Maryland; Key Biscayne, Florida; or San Clemente, California; and

(3) were recorded during the period beginning January 20, 1969, and ending August 9, 1974.

(b)(1) Notwithstanding any other law or any agreement or understanding made pursuant to section 2107 of title 44, United States Code, the Administrator shall receive, retain, or make reasonable efforts to obtain, complete possession and control of all papers, documents, memorandums, transcripts, and other objects and materials which constitute the Presidential historical materials of Richard M. Nixon, covering the period beginning January 20, 1969, and ending August 9, 1974.

(2) For purposes of this subsection, the term 'historical materials' has the meaning given it by section 2101 of title 44, United States Code.

*Availability of Certain Presidential Materials*

Sec. 102.(a) None of the tape recordings or other materials referred to in section 101 shall be destroyed, except as hereafter may be provided by law."

49. There are two further reasons which make it clear that the Act nullifies the agreement. First, the Act provides for the possession and control of the Presidential materials and tape recordings, "[not]withstanding any other law or any agreement or understanding made pursuant to Section 2107 of Title 44, United States Code." Thus, it need not even be inferred that the Nixon-Sampson Agreement is abrogated by the Act. This is particularly true as Congress utilized the word "notwithstanding", which it often uses to negate a prior act or law.
Secondly, the Act covers the same subject matter as the agreement and, with respect to the Presidential materials, is identical. Both the Act and the Agreement refer to 44 U.S.C. § 2101 for the definition of Presidential materials. And, like the Agreement, the Act differentiates between Presidential materials and tape recordings. *See* Appendix A, *second introductory paragraph.* Section 101(b)(2) of the Act provides that, "For purposes of this subsection, the term 'historical materials' has the meaning given it by section 2101 of title 44, United States Code."

50. House Committee Report, at 7.

51. "Sec. 105(a). The United States District Court for the District of Columbia shall have the exclusive jurisdiction to hear challenges to the legal or constitutional validity of this title or of any regulation issued under the authority granted by this title, *and any action or proceeding involving the ques-*

category of "Judicial Review", provides for the possibility that "just compensation" *may* be necessary. However, this would have to be predicated upon a determination by a court that there existed personal property rights in the Presidential materials and tape recordings.[52] Otherwise, in the opinion of Congress, "If the materials are already public property, the bill is simply an exercise of the congressional power under Article IV of the Constitution to dispose of the property of the United States . . .", and no compensation would be required.[53]

Second, with respect to the question of whether former President Nixon may rightfully assert any privilege as to the Presidential materials and tape recordings, the Act is also noncommital. None of the sections of the Act which provide for access to Presidential materials and tape recordings include any determination of this question. Subsection 102(b) of title I, which provides for access in "any judicial proceed-

ing" or pursuant to "court subpoena or other legal process," recognizes that the Presidential materials and tape recordings may be subject to the "rights, defenses or privileges" which either the federal government or "any person" may assert. Clearly, the "either-or" language of this subsection demonstrates that Congress did not resolve this question. Further, subsection 104(a) of title I, which requires the Administrator to establish regulations for public access, similarly takes no position on this question, for section 104(a)(5) provides that the Administrator must consider "the need to protect *any* party's opportunity to assert any legally or constitutionally based rights or privileges which would prevent or otherwise limit access to such recordings and materials." (Emphasis added.) Those sections providing for access for both Mr. Nixon and the federal government likewise do not provide any indication whether or not Mr. Nixon has the right to assert any privilege to the Presidential materials and tape recordings.[54]

---

*tion of title, ownership, custody, possession, or control* of any tape recording or material referred to in section 101 or involving payment of any just compensation which may be due in connection therewith. Any such challenge shall be treated by the court as a matter requiring immediate consideration and resolution, and such challenge shall have priority on the docket of such court over other cases." (Emphasis added.)

52. Section 103 provided that "if any court of the United States determines that any provision of title I of this legislation deprives an individual of his property without just compensation, then compensation shall be made to such individual from the Treasury of the United States." House Committee Report at 11 (Analysis of Section 103) Section 103 of S. 4016, which provided for compensation, was incorporated in Section 105 of the final version of the Public Law 93–526. And, as stated by Congressman John Brademas, a sponsor of the Act:
"The amendment also deletes the express language in the House-passed bill which provides that the bill takes no position on ownership of the material prior to enactment.
The legislation still takes no position on ownership. However, the Senate felt that this language was unnecessary because the

legislative history in the Senate and House is clear on this point."
120 Cong.Rec., 93rd Cong., 2d Sess. at H. 11444 (daily ed., Dec. 9, 1974).

53. House Committee Report, at 7. It is also notable that in analyzing section 103(a) of title I of the Act, the committee stated that:
"Section 103 also provides that the provisions of title I of this legislation shall not be construed as making any determination with respect to any private property right of title to the recordings or materials, if any such right existed before the date of enactment of title I of this legislation. The committee does not intend this legislation to make any decision, determination, or other rule with respect to the existence or extent of any such private property rights. It is the opinion of the committee that the question of private property rights with respect to the recordings or materials should be left for determination by an appropriate court." *Id.* at 11.
*See* footnote 52, *supra.*

54. Subsection 102:
"(c) Richard M. Nixon, or any person whom he may designate in writing shall at all times have access to the tape recordings and other materials referred to in section 101 for any purpose which is con-

Thus, it is the opinion of this Court that while the Presidential Recordings and Materials Preservation Act nullifies the Nixon-Sampson Agreement, the Act does not resolve the basic questions of ownership and privilege. It is therefore necessary that the Court determine whether these questions are present in an "actual controversy" which requires resolution.

 In order to ascertain whether there exists an actual controversy, it is necessary to examine the nature of the proceedings. *See* United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 3101, 41 L.Ed.2d 1039 (1974). The FOIA plaintiffs, whose applications for access to the Presidential materials and tape recordings were administratively denied, have brought suit under the Freedom of Information Act and the Administrative Procedure Act, seeking an injunction to restrain the enforcement of the Nixon-Sampson Agreement and a declaration that the Agreement is invalid and that the Presidential materials and tape recordings are government records and not the personal property of former President Nixon. Clearly, even if there never had been an agreement, this Court would have to determine the questions of ownership and privilege since Mr. Nixon, who is a defendant and intervenor in these actions, claims without reliance upon the Nixon-Sampson Agreement, that the Presidential materials and tape recordings are his personal property and not government records, a position shared by the government, and that they are protected by his assertion of his alleged right of "Presidential privilege". The Nixon-Sampson Agreement, therefore, is merely an additional ground asserted by both Mr. Nixon, a party in all these proceedings, and the government, for preventing access by the FOIA plaintiffs. Thus, the fact that the legislation nullifies the Nixon-Sampson Agreement does not resolve what is otherwise a live controversy.

The question thus presented is whether this Court should at this time decide the dispute as to ownership and privilege. The government defendants and Mr. Nixon argue that any adjudication would be premature. They argue that since Mr. Nixon has filed a new suit attacking the validity of the Presidential Recordings and Materials Preservation Act, this Court should delay decision on all issues. There are, however, compelling reasons for rejecting this argument.

 There are essentially three contentions asserted by Mr. Nixon and the government as to why the FOIA plaintiffs cannot have access to the Presidential materials and tape recordings: ownership, privilege, and the Nixon-Sampson Agreement. The third ground has been eliminated by statute and, since Mr. Nixon has not contested this in this suit, the Court must presume that the Act is valid. Thus, a resolution of the first and second grounds would end these disputes. However, it is apparent that if Mr. Nixon were to be successful in his new suit, the third ground may be reasserted. While this is possible, there is no reason for both the pending and the new suit not to go forward at the same time. *See* Weinstein v. Williams—McWilliams Industries, Inc., 313 F.Supp.

---

sistent with the provisions of this title, subsequent and subject to the regulations which the Administrator shall issue pursuant to section 103."

Subsection 103:

"The Administrator shall issue at the earliest possible date such regulations as may be necessary to assure the protection of the tape recordings and other materials referred to in section 101 from loss or destruction, and to prevent access to such recordings and materials by unauthorized persons. Custody of such recordings and materials shall be maintained in Washington, District of Columbia, or its metropolitan area, except as may otherwise be necessary to carry out the provisions of this title."

Although it might be argued that since section 103 only prevents "unauthorized access", thereby allowing the government access, pursuant to subsection 102(d), despite any privilege that may attach to the materials, this Court does not read this section in that manner. However, such a determination is not necessary in these cases.

876 (D.Del.1970).[55] Clearly, if Mr. Nixon is unsuccessful in the new suit, then a ruling in these pending proceedings would substantially advance the resolution of these disputes. If he is successful, then the Court can re-address the issues concerning the Nixon-Sampson Agreement, which have already been briefed and argued.[56]

Furthermore, the issues of ownership and privilege are basic questions extant in the controversy between Mr. Nixon, the government defendants and the Special Prosecutor.

As discussed below, those disputes require resolution at this time.[57] Therefore, it is obviously judicious to resolve these issues in all the pending cases.

 The defendants argue, however, by way of a motion to dismiss, that since the Presidential Recordings and Materials Preservation Act provides for "public access" pursuant to regulations to be promulgated by the Administrator of General Services,[58] an adjudi-cation of these questions may be unnecessary or at least premature. This contention is unacceptable for several reasons. First, Title I, Section 104(d) of the Act provides that: "The provisions of this title shall not in any way affect the rights, limitations or exemptions applicable under the Freedom of Information Act, 5 U.S.C. § 552 et seq. (sic)" Further, in explaining this provision of the Act, the House Committee Report states that: "It is the intent of the committee that this section not apply to litigation now pending in which access to the material relating to the Nixon Presidency under the Freedom of Information Act and title to the materials is in issue. But, rather, it is intended to apply to actions filed subsequent to enactment of this title." [59] Thus, it is impossible for this Court to conclude that an adjudication of the FOIA actions is unnecessary or premature. Secondly, as previously stated, these regulations do not resolve the basic questions of ownership and privilege and they are drawn in such a

55. There, the district court states that:
"If it is unclear whether the pending suit involves identical issues and the Court is unable to say that one suit is superior to the other in comparative utility, then the Court might properly allow both suits to go forward and defer action in the declaratory judgment action to see if the coercive suit will settle the controversy between the parties. If all the issues are not settled, the remaining issues could be dealt with by declaratory relief. For a full discussion of this subject, see 6A Moore Federal Practice ¶ 57.08 [6]."
313 F.Supp. at 879 (footnote omitted).

56. Judicial time and economy should not be abused by tactical fencing.

57. The question of ownership is particularly significant with respect to Mr. Nixon's fourth amendment claims. *See* Section X(c), *infra.*

58. Title I, Section 104(a) provides that:
"The Administrator shall, within ninety days after the date of enactment of this title, submit to each House of the Congress a report proposing and explaining regulations that would provide *public access* to the tape recordings and other materials referred to in section 101. Such regulations shall take into account the following factors:

(1) the need to provide the public with the full truth, at the earliest reasonable date, of the abuses of governmental power popularly identified under the generic term "Watergate";
(2) the need to make such recordings and materials available for use in judicial proceedings;
(3) the need to prevent general access, except in accordance with appropriate procedures established for use in judicial proceedings, to information relating to the Nation's security;
(4) the need to protect every individual's right to a fair and impartial trial;
(5) the need to protect any party's opportunity to assert any legally or constitutionally based right or privilege which would prevent or otherwise limit access to such recordings and materials;
(6) the need to provide public access to those materials which have general historical significance, and which are not likely to be related to the need described in paragraph (1) ; and
(7) the need to give to Richard M. Nixon, or his heirs, for his sole custody and use, tape recordings and other materials which are not likely to be related to the need described in paragraph (1) and are not otherwise of general historical significance."

59. House Committee Report, at 7.

way that these same questions will probably arise.[60] This Court will not require the FOIA plaintiffs to abandon their present actions on the mere possibility that they may be able to obtain access under the new regulations. It is a general principle that where wrongful conduct has occurred, the mere possibility that it will not re-occur, especially when it is only the statement of the defendant that it will not, is not sufficient to moot the claim for relief. *See* United States v. Concentrated Phosphate Export Ass'n, 393 U.S. 199, 89 S.Ct. 361, 21 L.Ed.2d 344 (1968). This principle is particularly applicable in the instant proceedings, where the FOIA plaintiffs, having been denied access, seek a statutory injunction to "enjoin the agency from withholding agency records and to order the production of agency records improperly withheld".[61] The mere allegation by the defendants that access may be possible under the regulations yet to be promulgated is not enough, particularly when the criteria upon which the regulations are to be drawn negates the assertion that the wrongful conduct will not re-occur.[62] Third, it must be recognized that while the FOIA plaintiffs have sought access to the materials, they also seek a declaratory judgment. It is, therefore, within the discretion of this Court, considering the public interest and the purpose of the statute, to decide whether a declaration should issue at this time. *See* Public Affairs Ass'n v. Rickover, 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962). It is the opinion of this Court that, given the express intention of Congress that the Presidential Recordings and Materials Preservation Act, insofar as it provides for a new avenue of access, shall not interfere with these pending cases, it is appropriate to consider the claims of the FOIA plaintiffs and, if they prevail, issue a declaratory judgment.

A similar examination of Nixon v. Sampson et al., reveals that while the Presidential Recordings and Materials Preservation Act has an obvious impact upon the justiciability of those claims for relief which rely upon the Nixon-Sampson Agreement, there does remain a dispute that is presently cognizable. Mr. Nixon, as plaintiff in C.A. 74–1518, seeks not only a writ of mandamus, under 28 U.S.C. § 1361, to compel defendant Arthur F. Sampson to comply with the provisions of the Presidential Libraries Act, 44 U.S.C. § 2108(c), and thereby effectuate the Nixon-Sampson Agreement, but also seeks an injunction in the nature of specific performance to compel the defendants to comply with the terms and conditions of the agreement so as to protect his alleged constitutional rights, particularly his alleged right of "Presidential privilege". Since this Court has determined that the Presidential Recordings and Materials Preservation Act nullifies the Nixon-Sampson Agreement, there can be no justiciable controversy which would permit a decision on the issue of whether, under the Presidential Libraries Act, defendant Sampson owes a specific statutory duty to Mr. Nixon to effectuate the Nixon-Sampson Agreement which would not necessitate the exercise of official discretion. Such a determination would, of course, have required this Court to ascertain the validity of the agreement for it is axiomatic that a writ of mandamus will not issue to compel a government official to do an illegal act.[63] Plaintiff Nixon's request for injunctive relief, however, remains partially justiciable.

To the extent that Mr. Nixon seeks injunctive relief to compel the defendants, in their official capacity, to comply with the Nixon-Sampson Agreement, the action is barred by sovereign immunity. *See* Larson v. Domestic and Foreign Commerce Corp., 337 U.S. 682,

---

60. *See* footnote 58, *supra*.

61. 5 U.S.C. § 552(a)(3).

62. *See* footnote 58, *supra*.

63. This is the standard issue raised upon a request for a writ of mandamus. *See, e. g.* Feliciano v. Laird, 426 F.2d 424 (2d Cir. 1970).

69 S.Ct. 1457, 93 L.Ed. 1628 (1949). And to the extent that Mr. Nixon seeks injunctive relief to prevent certain of the defendants from interfering with the agreement, the action is, for the same reasons as those applicable to the action for a writ of mandamus, not justiciable. To the extent, however, that Mr. Nixon seeks injunctive relief to prevent the defendants from infringing upon his alleged constitutional rights, the action is maintainable and this Court has jurisdiction to make that determination. *See* Bell v. Hood, 327 U.S. 678, 682, 66 S.Ct. 773, 90 L.Ed. 939 (1946). But, the conduct sought to be enjoined must be beyond that which is sanctioned by the Presidential Recordings and Materials Preservation Act. For, otherwise, the claim would not be that the defendants were acting unlawfully, but that the Act is unconstitutional. Notably, Mr. Nixon has not amended his pleadings in this proceeding to include such a challenge; rather, he has filed a new suit for declaratory and injunctive relief.[64] While it would appear that the Courts should therefore grant the defendants' motion to dismiss the complaint, the Court will not do so since it is apparent that if Mr. Nixon is successful in that suit, his present claims for relief would be cognizable. *See* Weinstein v. Williams-McWilliams Industries, Inc., *supra*. The Court will instead stay the proceedings with respect to those claims which are based upon the Nixon-Sampson Agreement pending a decision in the new suit.[65] However, the Court will decide the issue of infringement with respect to the FOIA plaintiffs' requests under the FOIA, and with respect to the November 9th Agreement, which remain justiciable.

The controversy concerning the alleged infringement of Mr. Nixon's rights exists apart from both the Nixon-Sampson Agreement and the Presidential Recordings and Materials Preservation Act. Mr. Nixon seeks to enjoin the defendants, particularly Mr. Philip W. Buchen, counsel to President Ford, from permitting the Special Prosecutor to have access to the materials. He claims that this is not only a violation of his alleged "right and duty to protect the constitutionally-based privilege of confidentiality" of the Presidential materials and tape recordings, but also his fourth amendment rights to be free from unreasonable searches and seizures and privacy.

Furthermore, President Ford, on November 9, 1974, entered into an agreement with the Office of the Special Prosecutor whereby the Special Prosecutor would be permitted to have access for the purpose of accommodating the needs of the Special Prosecutor with respect to "ongoing criminal investigations and prosecutions within the Special Prosecutor's jurisdiction." Appendix B, Intro. ¶. And, the Special Prosecutor, who is an intervenor-defendant in C.A. 74–1518, has counterclaimed for a declaration of the validity and enforceability of the November 9th Agreement, as well as having moved for summary judgment in C.A. 74–1518. This controversy does not depend upon the enforceability of the Nixon-Sampson Agreement,[66] but rather upon the basic questions of ownership and privilege raised by the FOIA plaintiffs' cases. Moreover, as previously noted, Mr. Nixon does not rely upon

---

64. C.A.No. 74–1582.

65. The Court will issue an order of even date of this opinion.

66. Mr. Nixon argues, however, that the Nixon-Sampson Agreement, if enforceable, would serve as a bar to access by the Special Prosecutor. Thus he contends that, like the FOIA cases, this controversy should not be resolved until the new action in which he contests the Presidential Recordings and Materials Preservation Act is resolved. This is not persuasive, however, since the question here is not whether the Nixon-Sampson Agreement is valid, but whether it was within the discretion of the Administrator to delay the enforcement of the agreement in the interests of the Special Prosecutor. The Court finds that it was, as the time of enforcement of the agreement was discretionary.

the Nixon-Sampson Agreement to establish his claim of ownership or his right to assert a privilege, which are necessary if he is to prevail in this controversy. Thus, these questions are squarely before the Court.

Moreover, the Presidential Recordings and Materials Preservation Act does not resolve this controversy. Although Section 102(b) of the Act provides that: "Any request by the Office of Watergate Special Prosecution Force, whether by Court subpoena or other lawful process, for access to such recordings or materials shall at all times have priority over any other request for such recordings or materials," this section can only be construed to afford the Special Prosecutor "priority" of access, not the right of access. Nor can section 102(d) which provides for access for "lawful government use" be construed as a limitation or expansion of these rights. Thus, the questions of ownership and privilege under the Nixon suit and the Special Prosecutor's counterclaim are justiciable. Furthermore, they require immediate resolution.

Having determined that the questions of ownership and privilege are raised in a live controversy, the Court will resolve these questions. Prior to reaching the merits, however, it is necessary to determine whether the motions for summary judgment and partial summary judgment meet the requirements of Rule 56 of the Federal Rules of Civil Procedure.

## VII. RULE 56

Having determined that the questions relating to the Nixon-Sampson Agreement are not at this time justiciable, it is left to determine whether there are genuine issues of material fact with respect to the claims relating to ownership, privilege and the fourth amendment. Rule 56, Federal Rules of Civil Procedure. As to the issues of privilege and the fourth amendment, the moving parties are clearly entitled to a judgment as a matter of law. With respect

to the question of ownership, however, Mr. Nixon contends that there are genuine issues of material fact which cannot be resolved on a motion for summary judgment.

The former President claims that the evidence is not conclusive as to the practices of other former Presidents. However, the practices of former Presidents are not adjudicative facts.[67] Neither are they material to a resolution of the legal issues involved in this case.

Nevertheless, the parties have submitted voluminous briefs and appendices in which the practices of many, if not all, of the past Presidents are set forth. What Mr. Nixon really contests, then, are the assumptions drawn by the other parties based upon the information therein. The Court, however, will not rely upon any of these disputed "assumptions", and will make its determination of the issues on motions for summary judgment and partial summary judgment based solely upon facts which are not in dispute.

■ There is no dispute as to the nature of the "Presidential materials and tape-recorded conversations." Mr. Nixon has admitted that these materials and tape-recorded conversations were generated or retained by himself and others on his behalf during his tenure in office, and that they contain documents, papers, tapes and other materials, all of which relate to the official business of the government of the United States, and many of which relate directly to the conduct of the Office of the President. Thus, the question presented is purely a question of law. The FOIA plaintiffs seek a declaration that these materials and tapes belong to the government and may not be barred from public access under the FOIA. Mr. Nixon and the government contest this claim, arguing that since Mr. Nixon owns the "Presidential materials and tape recordings", they cannot be considered "records" within the meaning of the FOIA. In this position the government concurs,

---

67. *See* Schick v. Reed, 419 U.S. 256, 95 S.Ct. 379, 42 L.Ed.2d 430 (1974).

and adds that the materials cannot be obtained under the FOIA because the White House is not an "agency" within the meaning of the FOIA and, therefore, these materials are not "records" within the meaning of the Act.

Before turning to the merits, it is necessary to set forth with more particularity the nature of the "Presidential materials and tape-recorded conversations", which are estimated to comprise 42 million items. Based upon the pleadings,[68] the hearings,[69] and the submission by the government,[70] the Court finds that the "Presidential materials and tape recordings" are comprised of the following categories:

1) *Materials and tape-recorded conversations of the Office of the President, generated or retained by the former President or by others on his behalf, relating to the performance of*
*the constitutional powers and duties of the Office of the President.* These communications include all the White House Central Files and all the White House Special Files, as well as many materials and tape-recorded conversations which were never in these files. These communications include memoranda, documents, and papers of the former President, the White House Staff and aides, and they include classified papers and documents relating to the national defense, and other ongoing interests of the government.[71]

2) *Materials of the Executive agencies and departments relating to the business of government.* These materials include documents, papers and communications of the Executive agencies and departments, as well as documents, papers, and communications sent from and between the vari-

---

68. *See e. g.*, Answer of intervenor-defendant Richard M. Nixon, C.A. 74–1533; Plaintiff Nixon's Motion for Preliminary Injunction and Amended Motion for Preliminary Injunction of October 29, 1974 in C.A. No. 74–1518.

It is admitted by all parties that the materials and tape-recorded conversations also contained purely private matters. The FOIA plaintiffs have stated on the record that they do not seek access to these materials or conversations.

69. At the hearings on the motions for preliminary injunctions evidence was introduced by way of testimony and depositions as to the nature of the "Presidential materials and tapes", (hereinafter, TR. or by reference to a particular deposition, *see* footnotes 7–15, *supra*.).

70. In order to ascertain with more specificity the nature of the 42 million items in question, the Court ordered the government to submit indices and descriptions of the materials and tapes, in accordance with established procedures in such cases. *See*, Vaughn v. Rosen, 157 U.S.App.D.C. 340, 484 F.2d 820 (1973). This submission was filed on November 14, 1974 (hereinafter, "Government Submission".)

71. Examples of materials and tape-recorded conversations falling into this first category are: 888 original tape recordings and approximately 60–75 copies of conversations in the White House Oval Office and in the Executive Office Building (Government's Sub-

mission, document entitled "Materials Held in Safe Zone 128 and Room 429 EOB"); "memoranda to the President for his information, review, and decision including proposed Presidential decisions and instructions" (Government Submission, document entitled "Categories of Nixon Administration Materials Held by National Security Council"); "memoranda of conversations between the former President and foreign Heads of Government/State and other foreign dignitaries including, but not limited to, Foreign Ministers and other Cabinet Officers, Ambassadors, and Special Emissaries" (*id.*); "records of appointments and meetings with U. S. Cabinet officers and other officials pertaining to national security matters" (*id.*); "defense-related papers associated with deployment of forces, budget, research and development, and organization/command structure" (*id.*); "telegrams originating in the White House dispatched to foreign governments, U. S. ambassadors and force commanders relating to foreign policy and national security decisions" (*id.*); "sensitive incoming cable traffic associated with negotiations, plans, evaluations and the impact of decisions taken on national security" (*id.*); and records embodying "thousands of communications between the former president and his aides and [relating] to topics covering the enormous range of responsibilities which fall within the function of the Presidency" (plaintiff Nixon's Amended Motion for Preliminary Injunction, No. 74–1515, p. 4., filed on October 29, 1974).

ous Executive agencies and departments.[72]

3) *Materials and Communications in and out of the White House files relating solely to the private lives and activities of the former President, his family, and all other persons taking part or described in said materials and communications.*[73]

Because none of the above facts are disputed by any of the parties, and because the above facts are the only facts necessary to a thorough consideration of the legal issues relevant herein, this Court holds that a summary judgment under Rule 56, Fed.Rules of Civ.Proc. is appropriate under the circumstances. With this issue, and all procedural issues, now decided, the Court turns to the merits of this case and the first substantive question, that of "ownership".

## VIII. OWNERSHIP

POINT ONE: THE CLAIM OF OWNERSHIP OF FORMER PRESIDENT NIXON TO THE "PRESIDENTIAL MATERIALS AND TAPE-RECORDED CONVERSA-

TIONS" OF THE NIXON ADMINISTRATION IS CONTRARY TO THE GENERAL PRINCIPLE OF LAW THAT THAT WHICH IS GENERATED OR KEPT IN THE ADMINISTRATION AND PERFORMANCE OF THE POWERS AND DUTIES OF A PUBLIC OFFICE BELONG TO THE GOVERNMENT.

 It is a general principle of law that that which is generated, created, produced or kept by a public official in the administration and performance of the powers and duties of a public office belongs to the government and may not be considered the private property of the official. United States v. First Trust Co. of St. Paul, 251 F.2d 686, 688 (8th Cir. 1958), aff'g First Trust Co. of St. Paul v. Minnesota Historical Soc., 146 F.Supp. 652 (D.Minn.1956), wherein the Court of Appeals set forth the well-settled principle that:

"[R]ecords of a government officer executed in the discharge of his official duties . . . are public documents and ownership is in the United States."

72. Examples of materials falling into this second category are: logs, diaries, and calendars of members of the Executive Branch which illustrate the organization, functions, procedures, operations, and other activities of the Executive Branch (Anderson Ex. 2 at 736, 778; Ex. 4 at 515, 521, 560); the files of the Chairman and of the members of the Council of Economic Advisors (Government's Submission, document entitled "Description of Presidential Materials of the Nixon Administration Sent to the National Archives Building by the Office of Presidential Papers"); various documents relating to task force studies on such matters as rural development, the mentally handicapped, prisoner rehabilitation, air pollution, science policy, low income housing, urban renewal, higher education, business taxation, oceanography, and economic growth (Governments' Submission, memorandum dated March 7, 1973, from William F. Matthews, White House Chief of Files); memoranda to Dr. Henry Kissinger from the State Department (Government's Submission, memorandum dated January 12, 1972, from William F. Matthews; Nesbitt Testimony at 76–77); virtually all of the files of at least the three agencies with responsibility for vast areas of government policy and action—the Domestic Council, the Council of Economic Advisors, the Council of International Economic Policy (Nesbitt Dep. Tr. at 15, 20–21; Government's Submission, document entitled "Description of Presidential Materials of the Nixon Administration Sent to the National Archives Building by the Office of Presidential Papers").

73. Examples of materials and communications falling into this third category are: personal gifts to the former First Family (Government's Submission, document entitled "Description of Presidential Materials of the Nixon Administration Sent to the National Archives Building by the Office of Presidential Papers"); birthday cards, anniversary cards, wedding invitations, Christmas cards, Easter cards, Thanksgiving cards, Valentines, mail from children and adults, get-well cards and letters of sympathy and encouragement with regard to Watergate, and documents labelled as Mrs. Nixon's "Social Files" (Government's Submission, Memoranda For the Record from William T. Matthews, dated July 23, 1970 through November 14, 1973).

251 F.2d at 688.[74] *Cf.* White v. United States, 164 U.S. 100, 103, 17 S.Ct. 38, 41 L.Ed. 365 (1896); Wilson v. United States, 221 U.S. 361, 380, 31 S.Ct. 538, 55 L.Ed. 771 (1912). *See also* United States v. Chadwick, 76 F.Supp. 919 (N. D.Ala.1948):

"[t]he notes, memoranda, statements and other material made and taken by [a public official] in the course of said employment, were and are, the property of the Government."

76 F.Supp. at 923. In *Chadwick,* the district court in fact ordered the return of the "notes, memoranda, statements and other material" which were taken by the public officer when he left office.

This principle has also been followed by the states. In Coleman v. Commonwealth, 25 Grattan (66 Va.) 865 (1874), the Virginia Supreme Court of Appeals held that:

"whenever a written record of the transactions of a public officer in his office, is a convenient and appropriate mode of discharging the duties of his office, it is not only his right but his duty to keep that memorial, whether expressly required so to do or not; *and when kept it becomes a public document—a public record belonging to the office and not the officer; it is the property of the state and not of the citizen; and is no sense a private memorandum."*

25 Grattan (66 Va.) at 881 (emphasis added). *See also* Robison v. Fishback, 175 Ind. 132, 93 N.E. 666 (1911); People v. Peck, 138 N.Y. 386, 34 N.E. 347 (1893). In *Peck,* the court held that information given to a public official and related to the administration of that office gave rise to an implied duty to preserve the information for the office and then the public. 138 N.Y. at 395, 34 N. E. at 355. Moreover, the court in *Peck* opined that the fact that the official was not required to keep the information was not determinative. *Id., See also, Sandy White, supra,* 164 U.S. at 103, 17 S.Ct. 38.

This principle has also found expression in cases involving the question of whether a document or other material generated by a public official is outside the scope of his duties and therefore susceptible to copyright. The most well-recognized case in this area is that of Public Affairs Associates, Inc. v. Rickover, 109 U.S.App.D.C. 128, 284 F. 2d 262 (1960), rev'd and rem'd 369 U.S. 111, 82 S.Ct. 580, 7 L.Ed.2d 604 (1962), on remand, 268 F.Supp. 444 (D.D.C. 1967). The case concerned an action by a publisher for a declaratory judgment as to its right to publish certain uncopyrighted speeches given by Vice Admiral Hyman G. Rickover, who had refused to allow the speeches to be published, claiming that he owned the speeches and that they were protected by a secured copyright. 284 F.2d at 264–265. The publisher argued that the speeches "resulted from [Rickover's] official responsibilities" and, therefore, were the property of the government. Thus, a copyright would be contrary to 17 U.S.C. § 8, which provides, "No copyright shall subsist in * * * any publication of the United States Government." 284 F.2d at 267–268 (footnote omitted). The Supreme Court, reversing and remanding

---

74. The United States argued in its brief to the Eighth Circuit Court of Appeals that: "The right of a government (state or Federal) to written records of its employees produced in the performance of their official duties has been uniformly recognized by the decided cases. The doctrine adopted by the decisions is one that is, in large part, so self-evident that there has been relatively little litigation in this area . . . This rule is not merely an extension of normal principles governing a master-servant relationship. The peculiar status of public employment and the need for records bearing on the carrying out of governmentally directed and financed tasks . . . intensifies the need for applicability where governmental employees and governmental records are involved . . . In fact, we have been unable to find any case, nor has one been cited, in which the records of a public employee produced in the discharge of his public duties have been held to be private property." Brief for the United States at 37–39 (footnotes omitted).

due to insufficiency of the record, set forth the test for determining whether the speeches belonged to the government. 369 U.S. at 113–114, 82 S.Ct. 580. The determination was to be made by ascertaining whether the speeches were prepared "in relation to the Vice Admiral's official duties," after careful examination of the "nature and scope" of the duties of the office. *Id.* at 113, 82 S. Ct. at 582.[75] On remand, the district court, finding that the use of government duplicating machinery, government paper, and the services of a government secretary not determinative, held that the speeches were not "written and delivered as a part of Admiral Rickover's official duties" and, therefore, were susceptible to copyright. 268 F.Supp. at 456.

In the instant matter, former President Nixon contends that this principle is inapplicable to "Presidential materials and tapes" of the Nixon administration, although he admits that these materials and tape-recorded conversations relate to the conduct of the Office of the President. He argues that the nature of the Office of the President permits an assertion of private ownership, and therefore enables him to prevent access to these materials and tapes by any person without his authorization. In support of this contention, he points to the fact that the President is a "constitutionally-elected" officer, and therefore he cannot be held to the principle that that which is generated or kept in the administration and performance of a public office belongs to the government.

POINT TWO: FORMER PRESIDENT NIXON'S ASSERTION OF OWNERSHIP OF THE DOCUMENTS, PAPERS, TAPES AND OTHER MATERIALS GENERATED OR RETAINED BY HIMSELF OR OTHERS ON HIS BEHALF IN THE PERFORMANCE OF HIS DUTIES AS THE PRESIDENT OF THE UNITED STATES IS CONTRARY TO THE NATURE OF THE OFFICE OF THE PRESIDENT AND THE CONSTITUTION.

■ In order to sustain the assertion that former President Nixon personally owns the documents, papers, tapes and other materials generated or retained by himself or others in the performance of his duties as the President of the United States, it must be found that an individual President is distinguishable from other public servants.[76] Such a conclusion, however, is untenable as it is refuted by the Constitution and the very concept of the Office of the President.

■ Art. II, Sec. I, cl. 1 of the Constitution provides that: "The exclusive Power shall be vested in a President of the United States of America. He shall hold his Office during the Term of four Years, and, together with the Vice President, chosen for the same Term, be elected, as follows . . . ." And, Sec. I, cl. 5 further provides that:

> "In Case of the Removal of the President from Office, or of his Death, Resignation, or Inability to discharge the Powers and Duties of the said Office, the same shall devolve on the Vice President, and the Congress may by Law provide for the Case of Removal, Death, Resignation or Inability, both of the President or Vice President, declaring what Officer shall then act as President, and such Officer shall act accordingly, until the Disability be removed, or a President shall be elected."

---

75. *See* Scherr v. Universal Match Corp., 417 F.2d 497 (2d Cir. 1969) ; aff'g 297 F.Supp. 107 (S.D.N.Y., 1967) ; note, Piracy in High Places—Government Publications and Copyright Law, 24 Geo.Wash.L.Rev. 423 (1956).

76. The principle that that which is done for the public by a public official belongs to the government in essence expresses the notion that that which is done on behalf of the sovereign belongs to the sovereign, which in our system of government is the public. Thus, the assertion of former President Nixon may well be said to be a claim that while in office he was in fact the sovereign, or at least the embodiment thereof.

These sections of Article II compel only one conclusion: the powers and duties of the executive inure to the Office and not to any individual office-holder; for the President, although elected to the highest office in the Nation, is but a transient holder of the public trust. Even though a President while in office may exercise specific and enumerated powers, Youngstown Sheet & Tube Co. et al., v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153 (1952), he is nevertheless a servant of the people. The President is elected by the people (Art. II, Sec 1, cl. 1), to execute the laws made by the people (Art. II, Sec. 1, cl. 7), and may be removed by the people (Art. II, Sec. IV); and, as recently articulated by the United States Court of Appeals for the District of Columbia:

"Though the President is elected by a nationwide ballot, and is often said to represent all the people, he does not embody the nation's sovereignty. *He is not above the law's commands* . . . . Sovereignty remains at all times with the people . . . ."[77]

Former President Nixon's claim of ownership is therefore repugnant to the very nature of the Office of the President.

It is important to remember that the original Articles of Confederation did not include a chief executive, and that there was a great reluctancy in formulating the Constitution to include such an Office because of the fear that it would lead to a monarchial rather than a republican form of government. The framers of the Constitution, however, were successful in establishing such an Office by convincing the people that a President was necessary for the proper administration of the government and that he would be in the nature of a chief magistrate and not a monarch.[78] James

Madison argued in The Federalist No. 69 that:

"The President of the United States would be an Officer elected by the people for *four* years, the King of Great Britain is a perpetual and hereditary prince. . . . What answer shall we give to those who would persuade us that things so unlike resemble each other? The same that ought to be given to those who tell us that a government, the whole power of which would be in the hands of the elective and periodical servants of the people, is an aristocracy, a monarchy, and a despotism."[79]

Thus, as the Supreme Court has cautioned, "it would be altogether unsafe to reason from any supposed resemblance between [the President and a monarch] where the rights and powers of the executive are brought into question." Fleming v. Page, 50 U.S. (9 How.) 603, 618, 13 L.Ed. 276 (1850). Rather, the President is a "creature of the Law." *See* United States v. Lee, 106 U.S. 196, 220, 1 S.Ct. 240, 27 L.Ed. 171 (1882). And, in order to preserve the freedom of the people, the President is bound by the law. *See* Youngstown Sheet & Tube Co., *supra* 343 U.S. at 655, 72 S.Ct. 863. Therefore, to uphold former President Nixon's claim of ownership would be to place him above the law as well as recognize that he may assert a right to the products of the office, which would be to compare him to a monarch. This the Court cannot do.

Further, not only must former President Nixon's claim of ownership be rejected as contrary to the nature of the office, but also because it is expressly negated by the Constitution itself. Art. II, Sec. I, cl. 6, generally known as the Emoluments Clause, provides that: "The President shall, at stated Times, receive for his Services, a Compensation,

77. Nixon v. Sirica, 159 U.S.App.D.C. 58, 487 F.2d 700, 711 (1973) (footnotes omitted) (emphasis added).

78. *See* The Federalist (Ford ed. 1898) Nos. 69, 70 (hereinafter, The Federalist).

79. The Federalist, No. 69 at 465.

which shall neither be increased nor diminished during the Period for which he shall have been elected, and he shall not receive within that Period any other Emolument from the United States, or any of them." Since the materials in question are directly related to the performance of the Office of the President and are of incalculable value, it would be contradictory to and a violation of, the Emoluments clause for a President to be given or to be permitted to assert a personal right to such materials.

Moreover, it was the intent of the framers of the Constitution to prevent the Office of the President from being a position of both power and profit. While they recognized that they could not divest the office of power, they sought to prevent the corruption of the office by removing profit. They feared that if the office offered both power and profit, the persons who sought the office would "not be the wise and moderate, the lovers of peace and good order, the men fittest for trust." 1 Farrand, The Records of the Federal Convention of 1787, at 82 (as recorded by Madison) (rev. ed. 1937).[80]

Mr. Nixon, however, argues that this Court must sustain his claim of ownership in order to preserve the "constitutional independence" of the Office of the President.

POINT THREE: THE INHERENT CONTINUITY OF THE OFFICE OF THE PRESIDENT NEGATES A CLAIM BY FORMER PRESIDENT NIXON THAT THE INDEPENDENCE OF THE OFFICE REQUIRES THAT HIS ASSERTION OF OWNERSHIP BE SUSTAINED.

Former President Nixon contends that in order to preserve the independence of the Office of the President, the Court must uphold his claim of ownership to the documents, papers, tapes and other materials generated or retained by himself and others on his behalf in the performance of his duties as President of the United States. While this assertion is actually an outgrowth of his argument that he has a personal "Presidential privilege" which attaches to the documents, papers, tapes and other materials which contain confidential communications between himself and his aides, his broad assertion of ownership to approximately 42 million items of materials must be rejected because it would undermine the continuity of the Office of the President.

As previously set forth, Art. II, Sec. I, cl. 1 of the Constitution provides that there be regular changes in the individuals who hold the Office of the President, and Sec. I, cl. 5, which provides for the procedure of who shall hold the Office upon the death, resignation, or other inability of the incumbent, recognizes that there may be unforeseen and irregular changes in the individual who holds the Office of the President.[81] These changes may be from year to year, or even from day to day. And, since the

---

80. Former President Nixon argues, however, that this is not an emolument because his right of ownership does not come into existence until he leaves office and, therefore, there could be no emolument as the Emoluments Clause by its terms applies only to a President's term of office. Even if this were true, then his claim of ownership would be a direct violation of Art. IV, Sec. III, cl. 2 of the Constitution, which provides that only the Congress can dispose of property belonging to the United States. For if his claim of ownership does not come into existence until he leaves office, then it can only be concluded that while he is in office the documents, papers, tapes and other materials were government property.

81. Clearly, the various sections of Article II make it irrefutable that no individual President has a "right" to hold the Office in perpetuity; furthermore, the 22nd amendment limits each individual to two terms in Office. Even if this were not the law, the fact that a President may not be reelected would mandate such a conclusion.

This proposition is supported by the rejection of any analogy between the Office of the President and a monarchy. See footnotes and accompanying text. In this century alone there have been several changes in the individual presidents other than by election. Calvin Coolidge became the 30th President upon the death of Warren G. Harding on August 2, 1923. Harry S. Truman be-

successor is charged with exercising the executive power, it is essential that he have for this purpose the documents, papers, tapes and other materials generated and retained by his predecessor in the exercise of the Article II powers and duties of the Presidency. To sanction the contrary result would undermine the notion of continuity of the Office of the President, and the government as a whole.[82]

The President of the United States is charged with significant powers and duties in the formulation and effectuation of the nation's foreign and domestic policies.[83] He is also charged by the Oath of Office with executing the Office of the President and preserving, protecting and defending the Constitution of the United States, U.S.Const. Art. II, Sec. I, cl. 7, and by Sec. II, cl. 3, with the duty to "take care that the laws be faithfully executed." In order to carry out these responsibilities, the Office of the President must seek and obtain information and advice from the "offices", "counsels", and "departments" of the Executive Branch.

■ Although the Office of the President consisted originally of only a few aides, it has continuously grown over the years;[84] today there are over five thousand persons who work within the Office of the Executive.[85] Moreover, in order to formulate, effectuate, and discharge the powers and duties of the Office of the President, numerous executive departments and agencies have been created,[86] all of which report to the Office of the President, and which are utilized in the formation and effectuation of the Nation's foreign and domes-

---

came the 33rd President upon the death of Franklin D. Roosevelt on April 12, 1945. Lyndon B. Johnson became the 36th President upon the death of John F. Kennedy on November 22, 1963. And, Richard M. Nixon (plaintiff, defendant and intervenor in these consolidated cases), who resigned from office on August 9, 1974, has been succeeded by Gerald R. Ford, now the 38th President of the United States. Congressional Directory 93rd Cong., 2d Sess. 412 (1974).

82. See H. L. A. Hart, The Concept of Law (Oxford U.Press 1972). The notion of continuity is a primary premise of our legal system and it is this notion which differentiates the constitutional system from the monarchial system of government.

83. Art. II, Sec. II of the Constitution provides that the Chief Executive shall be the Commander in Chief and shall conduct the war powers of the Nation; shall have the power to make treaties, with the advice and consent of Congress, and to conduct the nation's foreign affairs; and shall have the power and duty to formulate and recommend to Congress domestic policies and programs.

84. See E. Hargrove, Power of the Modern Presidency, 80–81 (1974).

85. By several Congressional Reorganization Acts, the Office of the Executive has continually expanded. In 1939, various agencies were incorporated within the Office of the Executive (5 U.S.C. § 133 et seq.) ; and today there are 14 "offices" with staffs in the Executive Office of the President which deal with matters formerly handled by the De-

partments of Defense, State, and Health, Education and Welfare. United States Government Manual for 1973/74 at 78 (1973). See also Lester G. Seligman, "Presidential Leadership: the Inner Circle and Institutionalization in the Presidency", (Wildavsky ed. 1969). These include, for example, the Office of Management and Budget, the Domestic Council, the Council on Environmental Quality, the Office of Telecommunications Policy, the Council on International Economic Policy, and the Council of Economic Policy Advisors.

86. Although the immediate Executive Office of the President has expanded only in recent years, the numerous executive "departments", all of which have reported and continued to report to the Office of the President, have a long history. These include: Department of State, established in 1789, the Department of the Treasury, established in 1789; the Department of Justice, established in 1870; the Post Office Department, established in 1872 (as part of the Executive) ; the Department of the Interior, established in 1849; the Department of Agriculture, established in 1889 (as part of the Executive) ; the Department of Commerce, established in 1913; the Department of Labor, established in 1913; the Department of Health, Education and Welfare, established in 1953; the Department of Housing and Urban Development, established in 1965; and the Department of Transportation, established in 1966. See R. Morris, Encyclopedia of American History (1973) ; Gov't Manual at 474–641.

tic policy. To allow any one President to remove the documents, papers, tapes and other materials which contain information vital to the ongoing affairs of the nation would be totally disruptive to the Office of the Presidency and would impair the ability of his successor in office to properly carry out the duties and powers of the office:

> "To recognize the constitutional independence of the Presidency is not to establish a sound premise for the conclusion that presidential records are the private property of the incumbent, whether in or out of office. On the contrary, it would seem that if any proposition collides with constitutional principles it is that the President should be exempted from the legal obligation that rests upon other officials in government to protect and refrain from appropriating to personal use records produced or received into custody by virtue of the exercise of a public office. To assume otherwise would be to vest in the highest office of the land, or in his heirs or descendants, the right to sell, to destroy, to disclose, to refuse to disclose, or otherwise to dispose of documents of the highest official nature involving information that, if improperly, prematurely, or irresponsibly revealed, could not only wreck private lives, but also endanger the security of the nation."

H. G. Jones, The Records of a Nation, 161–62 (1969).

Mr. Nixon, however, contends that his personal ownership of the "Presidential materials and tapes" has been sanctioned by precedent.

**POINT FOUR: THERE IS NO PRECEDENT WHICH COMPELS A FINDING THAT THE "PRESIDENTIAL MATERIALS AND TAPES" ARE THE PERSONAL PROPERTY OF FORMER PRESIDENT NIXON.**

There is no precedent which compels a finding that the "Presidential materials and tapes" of the Nixon administration are the personal property of former President Nixon. There are, in fact, only two cases in our jurisprudence which have involved documents, papers and other materials generated and/or retained in the conduct of the Office of the President.

In the most recent case, In Re Roosevelt's Will, 190 Misc. 341, 73 N.Y.S.2d 821 (1947), the executors of the estate of President Franklin D. Roosevelt sought a determination by surrogate's court that the instrument purporting to be a "gift *inter vivos*" of all his private and official papers to the government was valid. Thus, the question before the court was limited to whether the instrument contained the essential elements of a valid *inter vivos* gift. *Id.* at 821. The court, finding that it did, went no further. The question of whether President Roosevelt personally owned the documents and papers was not raised nor considered. The court, however, noted that during his lifetime, President Roosevelt had continuously placed official documents and papers in a depository and had stated that, " 'the ownership and title of all the papers, books, et cetera, should be in the Federal Government itself'." *Id.* at 823. The court also noted that whereas upon the death of President Roosevelt, the "White House Central Files" were removed to the library, the "Map Room Papers", "relating to the prosecution of the war," were "still in Washington, D.C., under the custody of the President of the United States." *Id.* at 825.

In Re Roosevelt's Will, therefore, provides no express precedent that the "Presidential materials and tapes" belong to former President Nixon. While it may be construed to assume such ownership, the example of the "Map Room Papers" evinces the repugnance of personal ownership to the continuity of the Office of the President. Had the heirs of former President Roosevelt been less cooperative, a possibility beyond the imagination of this Court, the case may well have been of a different nature.

The second and earlier case, Folsom v. Marsh, 9 Fed.Cas. p. 342 (No. 4, 901)

(C.C.D.Mass.1841) concerned a dispute between two private parties in an action for infringement of copyright. Folsom and Company, publishers of a multi-volume work entitled, "The Writings of George Washington", by Jarod Sparks, brought suit in equity to enjoin Marsh and Company, publishers of a two-volume work entitled "The Life of Washington in the Form of an Autobiography," written by Rev. Charles W. Upham, from continuing to publish the two-volume work, claiming that the defendant had copied verbatim a portion of the multi-volume treatise. *Id.* at 343. The defendants claimed that there could be no infringement since the material extracted was the papers of George Washington himself and, therefore, public in nature and not susceptible to copyright. *Id.* at 344. Circuit Justice Story, recognizing the copyright, held that there had been infringement and that an injunction should issue. *Id.* at 349.

While on first impression the holding in *Folsom* would lend support to former President Nixon's claim of ownership, Justice Story's opinion was carefully interwoven with indications of its limited *stare decisis* value, as well as an inference that a contrary conclusion may well have been reached had the equities not dictated the result.

First, Justice Story noted that President Washington had "deemed them his own private property," and that Mr. Sparks together with Mr. Chief Justice Marshall had procured the papers from his nephew, the late Mr. Justice Washington. 9 Fed.Cas. at 345. Thus, he was sensitive to the fact that publication by the defendants "must be injurious to the rights of property of the representatives and assignees of President Washington." *Id.* at 345. Secondly, he noted that the pirated work only included a fraction of the papers of the multi-volume treatise, and that copies of these papers were generally available. *Id.* at 347. However, Justice Story emphasized that the copyright law had encouraged publication of the papers of such presidents as "Jefferson and Madison, and other distinguished statesmen of our own country." *Id.* Thus, he was fearful that not to recognize the copyright would have an inhibiting effect on such publications. Third, he noted that the multi-volume treatise was a work of considerable labor, and that the equities were, therefore, against the pirate, despite the limited degree of the infringement. *Id.* Thus, it is understandable that Justice Story prefaced his opinion with the following caveat:

> "This is one of those intricate and embarrassing questions, arising in the administration of civil justice, in which it is not, from the peculiar nature of the controversy, easy to arrive at any satisfactory conclusion, or to lay down any principles applicable to all cases."

9 Fed.Cas. at 344. It therefore is apparent that decision in Folsom v. Marsh was not intended to be, and cannot be, considered an establishment of the right of personal ownership of a President in the documents, papers and materials generated or retained in the conduct of the Office of the President. Rather, Justice Story was careful to comment that had the government sought an interest in the matter, the result may have been different:

> "In respect to official letters, addressed to the government, or any of its departments, by public officers, so far as the right of the government extends, from principles of public policy, to withhold them from publication, or to give them publicity, there may be a just ground of distinction. It may be doubtful, whether any public officer is at liberty to publish them, at least, in the same age, when secrecy may be required by the public exigencies, without the sanction of the government. On the other hand, from the nature of the public service, or the character of the documents, embracing historical, military, or diplomatic information, it may be right, and even the duty, of the government, to give them publici-

ty, even against the will of the writers.

. . . . . .

But assuming the right of the government to publish such official letters and papers, under its own sanction, and for public purposes, *I am not prepared to admit, that any private persons have a right to publish the same letters and papers, without the sanction of the government, for their own private profit and advantage."*

9 Fed.Cas. at 347 (emphasis added).[87]

Former President Nixon, however, contends that the historical practice of past Presidents does sanction his private right of ownership.

POINT FIVE: THE HISTORICAL PRACTICE OF PAST PRESIDENTS DOES NOT EVINCE A CLEAR AND CONSTANT RECOGNITION OF OWNERSHIP OF THE MATERIALS GENERATED AND RETAINED IN THE CONDUCT OF THE OFFICE OF THE PRESIDENT.

Former President Nixon contends that his personal ownership of the "Presidential materials and tapes" is supported by the practice of past Presidents. In response, the statement of Judge Pine in Youngstown Sheet & Tube Co. v. Sawyer, 103 F.Supp. 569, 575 (D.D.C.1952), is particularly applicable and this Court adopts it: "Apparently, according to his theory, several repetitive, unchallenged, illegal acts sanctify those committed thereafter. I disagree."

An examination of the practices of past Presidents reveals that while some Presidents claimed that the materials in the White House were their personal property and, therefore, took them when they left office, this was not the opinion or the practice of all previous Presidents. For example, President Thomas Jefferson:

"deposit[ed] in the various departmental offices—State, Treasury, War, Justice, and Post Office—every document having any relation to the conduct of public business or being in any sense official in nature." [88]

More recently, Presidents Franklin D. Roosevelt and Harry S. Truman publicly stated that these materials were the property of the government.[89] But even if there existed an expectation and practice by past Presidents to the contrary, it would not necessarily dictate the constitutional standard. The Court must examine the purpose and function of such practice, for to merely rely on historical precedent would be "blind formalism". Williams v. Florida, 399 U.S. 78, 103, 90 S.Ct. 1893, 26 L.Ed.2d 446 (1970).[90]

A review of the literature concerning Presidential practice with regard to the disposition of Presidential papers and materials reveals that there were compelling reasons for Presidents to take their materials with them when they left office. H. R. Jones, in his learned work, The Records of a Nation: Their Management, Preservation and Use,[91] indicates that the most important factor which prompted Presidents to take Presidential papers and materials with them when they left office was the lack of assurance that they would not be indiscriminately thrown open to public

---

87. It was based upon this language that Attorney General Saxbe stated in his opinion that while the former President had an apparent right of ownership, it was subject to the "interests" of the government. Opinion of the Attorney General of the United States, September 6, 1974 (unpublished).

88. Statement of Julian P. Boyd, Editor, "The Papers of Thomas Jefferson," (Princeton Univ.Lib.), Brief of The Reporters Committee for the Freedom of the Press, et al., in Support of Motion for Preliminary Injunction, Exhibit A.

89. Records of a Nation, at 157, 162 n. 25; Christian Science Monitor, January 29, 1947.

90. In *Williams*, the Supreme Court held that the 12-man jury, although historically adhered to, was not necessary to "effect the purposes of the jury system." 399 U.S. at 102, 90 S.Ct. at 1907.

91. Hereinafter, Records of a Nation.

scrutiny.[92] As another scholar has stated Presidents feared that the end of the President's term would be a "signal for disclosure." [93] This is understandable since there was no provision or facility to house and protect these papers and materials. In fact, the National Archives did not even come into existence until 1934.[94] Even after its creation, there was no provision whereby these papers and materials could be deposited and access controlled. Thus, when President Franklin D. Roosevelt decided to deposit the Presidential papers and materials of his administrations with the government, the problem, as stated by Jones, was that "nowhere in past experience would there be found a logical pattern or practical solution to the complex problem of what disposition to make of the papers of an outgoing President." [95] Thus, in 1943, the archivists had to make up their own rules for access.[96]

Therefore, considering the problem that there was no place to deposit Presidential papers and materials, and the fear of disclosure, it is understandable that Presidents such as William H. Taft stated: "I do not think that I ought to burden the White House with these things and, therefore, want them sent to me." Index to the William Howard Taft Papers V. (1972).

This situation was altered, however, with the passage of the Federal Records Act in 1950, which was amended in 1955 to become the Presidential Libraries Act.[97] Under this Act, Presidential papers and materials could be deposited and access controlled.[98] Subsequently, every President has deposited the Presi-dential papers and materials under the Act.[99]

The practices of past Presidents must be viewed in light of these reasons for post-term retention of Presidential papers and materials. When so viewed, the practice may be considered not one of asserting a right of ownership, but of retention in trust for the public. *See*, First Trust Co. of St. Louis v. Minnesota Historical Society, 146 F.Supp. 652, aff'd, 251 F.2d 686 (8th Cir. 1958). And, even if a rule existed that a President, at the expiration of his term in office, could remove the Presidential papers and materials to hold them in trust and to protect their confidentiality, the passage of the Presidential Libraries Act eliminated the reason for such a rule, and it should not now be resurrected:

> "It is revolting to have no better reason for a rule of law than that it was laid down so [long ago]. It is even more revolting if the grounds upon which it was laid down have vanished long since, and the rule simply persists from blind imitation of the past." (Emphasis added.)

Holmes, The Path of the Law, 10 Harv. L.Rev. 457, 469 (1897).

A further reason for rejecting any such rule is that the scope of the office of the President has greatly expanded in this century, and has taken on many of the functions formerly assigned to the executive departments.[100] Thus, the papers and materials generated and retained in this office have become even more indispensible to the ongoing operations of the government.[101] That they

---

92. Records of a Nation at 159–160, 162.

93. David D. Lloyd, "The Harry S. Truman Library," American Archivist, XVIII (April 1955), 101–102.

94. National Archives Act of 1934, PL. 73–432, 48 Stat. 1122.

95. Records of a Nation at 147.

96. *Id.* at 153.

97. P.L. 84–373; 69 Stat. 695, codified at 44 U.S.C. § 2101 et seq., amending P.L. 81–754;

64 Stat. 583 (§ 507 of the Federal Records Act) [hereinafter, the "Presidential Libraries Act"].

98. *See* 44 U.S.C. §§ 2107, 2108, formerly § 507(a) & (e) of the 1950 Act.

99. *See* Government Brief in Opposition to Motions for a Preliminary Injunction, Appendix.

100. *See* footnote 86, *supra*.

101. *See* Section VII, "Point Three", *supra*.

should be removed and controlled by a former President further undermines the vitality of the rule.

Former President Nixon, however, argues that his right of ownership has been recognized by Congress and, therefore, must be accepted.

POINT SIX: CONGRESS HAS NOT SANCTIONED THE PERSONAL OWNERSHIP OF "PRESIDENTIAL MATERIALS AND TAPES" GENERATED AND RETAINED IN THE CONDUCT OF THE OFFICE OF THE PRESIDENT.

 An analysis of the relevant statutes and the legislative history reveal that Congress has never sanctioned the personal ownership of "Presidential Materials and tapes" generated and retained in the conduct of the Office of the President.

Former President Nixon argues that the Presidential Libraries Act of 1955, 44 U.S.C. §§ 2101, 2107, 2108, sanctioned the personal ownership of each President of the documents, papers, tapes and other materials generated and retained in the conduct of the Office of the President. Principally, he relies on section 2107 which provides in pertinent part that:

> "When the Administrator of General Services considers it to be in the public interest he may accept for deposit—
>
> "(1) the papers and other historical materials of a *President* or *former President* of the United States, *or other official or former official of the Government,* and other papers relating to and contemporary with a President or former President of the United States, subject to restrictions agreeable to the Administrator as to their use . . . ." (Emphasis added).

and which amended section 507(e) of the Federal Records Act of 1950, which provided in pertinent part that:

> "(e) The Administrator may accept for deposit—

> "(1) the *personal papers* and other *personal historical documentary materials* of the *present President* of the United States, his successors, heads of executive departments, and such other officials of the Government as the President may designate, offered for deposit under restrictions respecting their use specified in writing by the prospective depositors . . . ." (Emphasis added.)

Former President Nixon contends that since the word "personal" in section 507(e)(1) was not included in section 2107, Congress recognized the right of ownership of the President to all the documents, papers, tapes and other materials generated and retained in the conduct of the office of the President. The legislative history of the Act and the other sections of the 1955 Act require that this interpretation be rejected.

Preliminarily, it must be recognized that the impetus for the passage of the 1950 Federal Records Act was the desire to secure for the Nation the historical record contained in Presidential documents, papers and materials. Records of a Nation at 145–154. Congress sought to prevent the destruction of these valuable memorials of history which had so often been destroyed.[102] As Representative McCormack stated when presiding over the hearings concerning the 1955 amendments: "the matter should not be left to happenstance."[103] Thus, Congress established a statutory scheme to provide facilities for these materials.

Considering this general purpose, the omission of the word "personal" cannot be interpreted as recognizing a right of private ownership. In fact, the legislative history reveals that the word "personal" was omitted to expand the scope of materials relating to the life of a President that could be accepted and preserved, such as pre-Presidential materials and materials "outside the scope

---

102. *See* 1955 Hearings at 6–7 (Statement of Rep. McCormack).

103. *Id.*

of the personal collection of the President." 1955 Hearings at 24.

 The language of the statute itself rejects the former President's interpretation. It is axiomatic that a statute cannot be read in piecemeal. A reading of the other subsections of section 507 of the 1950 Act demonstrate not only that Congress distinguished between "personal" and "official" materials of the President, but also that section 2107 is still limited to "personal" materials.

Section 507(a)(1) of the 1950 Act provided in pertinent part that:

"Sec. 507. (a) The Administrator, whenever it appears to him to be in the public interest, is hereby authorized—

"(1) to accept for deposit with the National Archives of the United States *the records of any Federal agency* or of the Congress of the United States that are determined by the Archivist to have sufficient historical or other value to warrant their continued preservation by the United States Government . . . ." (Emphasis added).

This section was not changed by the 1955 amendments, but was left intact in section 2103 of title 44. It provides for the deposit of "records" of "any Federal agency". These records are the "official" records of the government, defined in 44 U.S.C. § 3301 which defines government records as:

"all books, papers, maps, photographs, or other documentary materials, regardless of physical form or characteristics, *made* or *received* by an agency of the United States government under Federal law or *in connection with the transaction of public business* and preserved or appropriate for preservation by that agency or its legitimate *successor* as evidence of the organization, functions, policies, decisions, procedures, operations, or other activities of the Government or because of the informational value of data in them." (Emphasis added)

Further, "Federal agency" includes the Office of the President, by the definition set forth in 40 U.S.C. § 472, which provides in pertinent part that:

"(a) The term 'executive agency' means any executive department or independent establishment in the executive branch of the Government . . . ."

"(b) The term 'Federal agency 'means any executive agency' or any establishment in the legislative or judicial branch of the Government . . . ."

Although this section does not expressly include the Office of the President, this is the clear interpretation. The Solicitor General has, in discussing section 507(a)(1) [sections 2103, 2104 as amended], opined that:

"The Presidency seems to have been regarded by Congress as a Federal agency, the official records of which would be subject to deposit pursuant to sections [2103 and 2104 of 44 U.S. C.]. Section 3(b) of the Federal Property and Administrative Services Act of 1949 . . . defines 'Federal agency' as including *inter alia*, 'any executive agency' and section 3(a) defines 'executive agency' as 'any executive department or independent establishment in the executive branch of the Government * * *' Other parts of that act appear to be applicable to the White House, among other agencies. See, e.g., sections 109, 201–206, 301–309."

Memorandum of Office of the Asst. Solicitor General (now Office of Legal Counsel) at 2 (July 24, 1951).

Thus, section 2107, when construed with section 2103, reveals not only that Congress distinguished between "official" and "personal" Presidential documents, papers and materials, but also that section 2107 must still be interpreted as only including "personal" documents, papers and materials. Therefore,

the contention of the former President must be rejected.[104]

This Court, however, recognizes that without reference to 44 U.S.C. § 3301 (definition of government records), the distinction between official and personal Presidential documents, papers and materials would be vague. Even without referring to section 3301, however, the general principle that documents, papers and materials generated and retained in the conduct of a public office which this Court has held to apply to the Office of the President, would cause the same result: that former President Nixon's contention be rejected.[105]

■ The Court, having tested former President Nixon's claim of ownership against the common-law, the Constitution, the history and practice of former Presidents, precedent, and the Acts of Congress, concludes that the "Presidential materials and tape-recorded conversations" which were generated, created, produced or kept in the administration and performance of the powers and duties of the Office of the President belong to the government, and are not personal property of the former President.

POINT SEVEN: TO THE EXTENT THAT THE PRESIDENTIAL MATERIALS AND TAPE-RECORDED CONVERSATIONS CONTAIN "RECORDS" WITHIN THE MEANING OF THE FOIA, THE FOIA PLAINTIFFS HAVE A RIGHT OF ACCESS TO THOSE RECORDS.

■ The government and former President Nixon contend that even if Mr. Nixon does not own the "Presidential materials and tape-recorded conversations" generated and retained in the conduct of the Office of the President, they nevertheless are not "records" within the meaning of the Freedom of Information Act.

The Freedom of Information Act, 5 U.S.C. § 552, provides in pertinent part that:

"(a)(3) . . . each agency, on request for identifiable records . . . shall make the records promptly available to any person. . . ."

The FOIA applies to the records of executive *departments* of the government. *See e.g.* Rose v. Department of Air Force, 495 F.2d 261 (2d Cir. 1974) (Defense); Stern v. Richardson, 367 F. Supp. 1316 (D.D.C.1973) (Justice); Tax Analysts & Advocates v. Internal Revenue Service, 362 F.Supp. 1298 (D.D.C.1973) (Treasury); National Parks & Conservation Ass'n v. Morton, 498 F. 2d 765 (D.C.Cir. 1974) (Interior). Moreover, these records would be available to "any person" even if they are sent to the Office of the President for his

---

104. This is further compelled by the fact that only officials of the government can, under the Act, deposit "official" records. *See* S.Rep.No.2140, 81st Cong., 2d Sess. at 16–17, quoted in 1950 U.S.Code Cong.Serv. at p. 3564. *See also* 44 U.S.C. §§ 3101, 3106.

105. Former President Nixon's argument that Congress recognized the right of personal ownership of "Presidential materials and tapes" by permitting former Presidents to take a tax deduction for them when they were donated to the government is likewise erroneous. Congress eliminated this deduction in the Tax Reform Act of 1969, P.L. 91–172, 83 Stat. 685 (December 30, 1969). And, although Congress took no express position in the language of the statute on the question of ownership, some members of Congress openly rejected any notion of pri-

vate ownership. For example, Senator John J. Williams of Delaware stated during the debate that:

"One of the things that bothers me about getting special tax benefits through the gift of official papers is that the parties doing this are making a profit from the 'charitable' giving of what are really official papers which, in my opinion, properly belong to the Government and not to them as individuals. I am sure that in many cases many of the papers are just plain junk, but to the extent that they do have value, they were developed by Government officials on Government time with the aid of Government staff personnel, were typed by Government secretaries on Government paper, and were even stored in Government files."

115 Cong.Rec.S. 20461 (daily ed. July 23, 1969).

consideration. *See* Environmental Protection Agency v. Mink, 410 U.S. 73, 93 S.Ct. 827, 35 L.Ed.2d 119 (1973). Thus, these records of the executive departments even though now in the Office of the President must still be considered as records under the FOIA and, therefore, accessible to applicants under the Act. Notably, although this Court has held that the Presidential materials and tape-recorded conversations are not the private property of former President Nixon, this fact would be an additional ground for rejecting his claim. For it is inconceivable that these "records" which would have been accessible when Mr. Nixon was in office, would be inaccessible when Mr. Nixon left office.

 It is the opinion of the Court that the essence of the government's and former President Nixon's claim is that the Office of the President is not an "agency" under the FOIA, and therefore the "Presidential materials and tape-recorded conversations" pertaining thereto are not "records" within the Act. This broad contention must be considered in light of the fact that the Office of the President is really two entities: the White House Office and the Executive Office of the President. *See* Soucie v. David, 145 U.S.App.D.C. 144, 448 F.2d 1067, 1074 (1971). The former includes the President and his immediate aides, and the latter includes congressionally-created executive "agencies" which assist the President in the formulation of policy and programs. *Id.* at 1074–1079. The executive agencies have been held to be within the meaning of the term "agency" of the FOIA, and "records" of such agencies may be accessible under the FOIA even though they have been sent to and are in the possession of the White House Office. *Id.* 1075–1076. Thus, the "records" of the executive "agencies" like the executive departments, even though now in the White House Office, must be considered "records" under the FOIA and accessible to applicants under the Act.

The remaining question then is whether the Office of the President (the White House Office) is an "agency" under the FOIA, making its "records" accessible under the Act. The language of the definition of the term "agency" does not distinguish between the White House Office and the Executive Office of the President. In fact, the definition of the term "agency" "specifically excludes Congress and the courts of the United States, but does not specifically exclude the President." Soucie v. David, *supra*, 145 U.S.App.D.C. 144, 448 F.2d at 1073 n. 17. Further,

> "the leading students of the APA, whose analyses are often cited by the Supreme Court, and who on some matters are in conflict with each other, seem to be in agreement that the term 'agency' in the APA includes the President—a conclusion fortified by the care taken to make express exclusion of 'Congress' and 'the courts.'"

Amalgamated Meat Cutters & Butchers Work v. Connaly, 337 F.Supp. 737, 761 (D.D.C.1971) (three-judge court) (citing R. Berger, Administrative Arbitrariness—A Synthesis, 78 Yale L.J. 965, 997 (1969); K. Davis, Administrative Arbitrariness—A Postscript, 114 U. of Pa.L. Rev. 823, 832 (1966); L. Jaffee, The Right to Judicial Review, 71 Harv.L. Rev. 401, 769, 778, 781 (1958)).

 This, however, is not conclusive. This question *cannot* be answered without consideration of the doctrine of the separation of powers. Congressional intrusions into the powers and duties of the Office of the President have been few, and they should not be assumed. It is the opinion of this Court that when Congress excluded the "executive" from the definition of "agency" within the FOIA, it did not go so far as to place the "records" of the President and his immediate aides, known as the White House Office, within the purview of the Act. This conclusion is supported by the recent amendments to the FOIA.[106]

106. P.L. 93–502, 120 Cong.Rec. ——; U.S.Code Cong. and Admin.News, (December 15, 1974) at p. 1798.

5 U.S.C. § 552(a)(3) has been amended to include subsection (e), which provides:

"(e) For purposes of this section, the term 'agency' as defined in section 551(1) of this title includes any executive department, military department, Government corporation, Government controlled corporation, or other establishment in the executive branch of the Government (*including the Executive Office of the President*), or any independent regulatory agency." (emphasis added)

In explaining the expanded definition of the term "agency", the Conference Report [107] states that:

With respect to the meaning of the term 'Executive Office of the President' the conferees intend the result reached in Soucie v. David, 145 U.S. App.D.C. 144, 448 F.2d 1067 (1971). The term is not to be interpreted as including the President's immediate personal staff or units in the Executive Office whose sole function is to advise and assist the President.

Thus, Congress has excluded those White House materials and tape-recorded conversations between the President and his aides from the purview of the Act by the new amendments. It is the opinion of this Court that in view of these new amendments and Congress's intention, and considering the doctrine of separation of powers, the present definition of the term "agency" should not include the White House Office but should only be extended to the Executive Office of the President, as previously differentiated. This, however, does not mean that "records" of the executive agencies and departments which were kept in the White House Office are immune from access under the FOIA, *See* Environmental Protection Agency v. Mink, *supra*;

Soucie v. David, *supra*. Therefore, the FOIA plaintiffs are entitled to a declaration as to such, as well as a declaration that they are "records" within the meaning of the FOIA.[108]

This, however, does not dispose of the matter, as former President Nixon contends that even if the "Presidential materials and tapes" do contain such "records", access may not be given to any FOIA applicant since it would violate his alleged constitutional right of "Presidential privilege". The FOIA plaintiffs seek a declaration to the contrary. Further, the question of privilege is also raised with respect to the November 9th Agreement between President Ford and the Special Prosecutor, as well as with respect to the government defendants responding to subpoenas and other Court orders. These, in turn, raise questions under the fourth amendment.

## IX. PRIVILEGE

A FORMER PRESIDENT MAY NOT ASSERT OR WAIVE THE PRIVILEGE WHICH ATTACHES TO THE CONFIDENTIAL COMMUNICATIONS RELATING TO THE CONDUCT OF THE OFFICE OF THE PRESIDENT CONTAINED IN PRESIDENTIAL MATERIALS AND TAPE RECORDINGS AS THE PRIVILEGE BELONGS TO THE GOVERNMENT AND MAY ONLY BE ASSERTED OR WAIVED BY THE INCUMBENT PRESIDENT.

Former President Nixon contends that he must have personal and exclusive control of access to and disclosure of Presidential materials and tape recordings which contain confidential communications relating to the conduct of the Office of the President in order to protect and preserve what he denominates as his constitutional right of

107. Conf.Rep. No. 93–1200, 12 U.S.Code Cong. and Admin.News, (December 15, 1974) at p. 6285.

108. Since the FOIA plaintiffs have also sought access, the government will be afforded the opportunity to raise any "exception" applicable, 5 U.S.C. § 552(b)(1–9), or executive privilege. *See* Soucie v. David, *supra*, 145 U.S.App.D.C. 144, 448 F.2d at 1079. This litigation, however, has not reached that stage.

"Presidential privilege." He argues that this privilege has been recognized by the Supreme Court in the recent case of United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). Based upon this premise, he claims that the defendants, officers of the United States government, may not have access to or disclose the Presidential materials and tape recordings, either to respond to a subpoena or other court order, or pursuant to the November 9th Agreement between President Ford and the Special Prosecutor, or in response to requests by private parties under the Freedom of Information Act.

It is extremely important to articulate the precise parameters of the question presented to the Court. Former President Nixon claims a personal "Presidential privilege" to confidential communications which took place in the Office of the President during his tenure, and which relate to the conduct of the office. He argues that this "Presidential privilege" is distinguishable from "executive privilege", the latter being applicable to state and national security secrets, the former apparently encompassing all communications to and from the former President concerning the conduct of the Office of the President. This presents a difficult definitional problem. On the one hand, the former President defines "Presidential privilege" by the fact of a confidential communication to or from the President, and "executive privilege", on the other hand, by the substance of the information contained therein. Thus, he asserts that even though he has left office, it is he who has the right to assert or waive the "Presidential privilege", but it is the government who has the right to assert or waive the "executive privilege". This dichotomy, however, is unacceptable for numerous reasons.

### A. *The Function of the Privilege*

Executive privilege is founded upon the public interest in the effective performance of the constitutional powers and duties assigned to the Executive Branch. *See* Carl Zeiss Stiftung v. E. B. Carl Zeiss, Jena, 40 F.R.D. 318, 325 (D.C.1966) ("executive privilege" is essential to the quality of its functioning). And, based upon the function of executive privilege, it is well-settled that the privilege belongs to the government. United States v. Reynolds, 345 U.S. 1, 8, 73 S.Ct. 528, 97 L.Ed. 727 (1953).

Mr. Nixon, however, relying on the recent Supreme Court case of United States v. Nixon, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974), contends that unlike executive privilege, the privilege which protects confidential communications of the President relating to the conduct of the Office of the President is a "Presidential privilege" which inures to the President during whose term in office the communications occurred. United States v. Nixon, *supra,* however, does not lend support to Mr. Nixon's reasoning. Rather, the Supreme Court's analysis of the function of the privilege which protects confidential communications relating to the conduct of the Office of the President overwhelmingly supports the contrary conclusion.

In United States v. Nixon, *supra,* the Supreme Court, holding that an assertion of privilege based "only on the generalized interest in confidentiality" could not "prevail over the fundamental demands of due process of law in the fair administration of criminal justice," 418 U.S. at 713, 94 S.Ct. at 3110, recognized that the protection of the confidentiality of presidential communications is constitutionally based, 418 U.S. at 711, 94 S.Ct. at 3109. Significantly, the Court, while noting that the privilege has "all the values to which we accord deference for the privacy of all citizens," determined that the privilege should be recognized because it is in the "public interest" that the "Chief Executive", in the performance of Article II powers, must be free, with his assistants, "to explore alternatives in the process of shaping policies and making decisions and to do so in a way many would be unwilling to express

except privately." 418 U.S. at 708, 94 S. Ct. at 3107. The privilege accepted by the Supreme Court is not personal, but rather, "the privilege can be said to derive from the supremacy of each branch within its own assigned area of constitutional duties." 418 U.S. at 705, 94 S.Ct. at 3106. The Court opined that the privilege only exists insofar as it "relates to the effective discharge of a President's powers." 418 U.S. at 711, 94 S.Ct. at 3109.

The Supreme Court's analysis of the function of the privilege therefore compels only one conclusion, that it inures to the Office of the President, not to any particular office-holder. Thus, the privilege which protects the President's confidential communications must be considered but "one species of executive privilege." Senate Select Committee on Pres. Camp. Act. v. Nixon, 498 F.2d 725, 729 (D.C.Cir., 1974). For, like that which protects military and state secrets, *it is also founded upon the public interest in the effective performance of the constitutional powers and duties assigned to the Executive Branch* and, therefore, also belongs to the government.[109] This is so even if a limited view of the privilege is taken, for it is apparent that the crux of the Supreme Court's decision in United States v. Nixon, *supra*, is that while the privilege protects conversations that have occurred, its true function is to assure that *future* presidents and their assistants will not be inhibited in expressing their "candid, objective, and even blunt or harsh opinions." 418 U.S. at 706, 712, 94 S.Ct. at 3107, 3109, n. 20.

B. *The Exercise of the Privilege*

The assertion or waiver of the privilege is an exercise of the executive power, and since this power is vested in the incumbent President, U.S.Const., Art. II, Sec. I, cl. 1, it follows that the former President may not assert or waive the privilege.[110] Nevertheless, Mr. Nixon contends that since these confidential communications occurred during his tenure in office, he has the right to assert or waive the privilege. The reasons for the above-stated principle, however, require that Mr. Nixon's contention be rejected.

This principle, that the assertion or waiver of the privilege is an exercise of executive power, has been expressed in the "head of the department" concept. In the area of military and state secrets, it is well-settled that "[the privilege] is not to be lightly invoked. There must be a formal claim of privilege, lodged by the *head of the department* which has control over the matter, after actual personal consideration by that officer." United States v. Reynolds, 345 U.S. at 7, 73 S.Ct. at 532 (emphasis added). The reason that the "head of the department" must raise the privilege is apparent.

Only a government official, and particularly the "head of the department", has sufficient knowledge to determine, after "actual personal consideration of the matter," whether the disclosure of certain information would affect, adversely or not, the ongoing interests of the government. For, only (s)he knows what those ongoing interests are. This will depend upon a myriad of information, both current and past, to which only the head of the Department will have access, and which will be necessary to make a decision involving "considerations of policy . . . of extreme magnitude". Ware v. Hylton, 3 Dall (3 U.S. 199, 260 (1796). Clear-

---

109. It is the general rule that to determine to whom a privilege belongs, the Court must ascertain whom the privilege benefits. *Cf.* Turner v. Black, 19 Ill.2d 296, 166 N.E.2d 588, 595, (1960).

Thus, since the executive privilege exists for the benefit of the people, it is perhaps technically proper to state that the privilege belongs to the people. However, since the government is equatable with the people, U.S.Const., Preamble, it is not misleading to state that the privilege belongs to the government.

110. This was long ago articulated by President John Quincy Adams, who stated: "the right of withholding information pertains to the office and not to the man." Records of a Nation at 162.

ly, a private individual does not have this capacity. For example, in the case of In re Grove, 180 F. 62 (3rd Cir. 1910), a private individual, Grove, had been held in contempt for refusing to produce copies of plans and specifications for the construction of certain torpedo boat destroyers for the United States, for which his company had submitted a bid. The Third Circuit Court of Appeals held that Grove's refusal was proper and not contemptuous since only the Secretary of the Navy, who had informed the Court that, after consideration of the matter, disclosure "[would not cause] the discovery of military or other secrets detrimental to the public interest," was in a position to make such a determination. 180 F. at 67.[111] It was upon consideration of the matter as revealed in *Grove* that the Supreme Court in *Reynolds* held that "the privilege belongs to the Government and must be asserted by it; it can neither be claimed nor waived by a private party." 345 U.S. at 7, 73 S.Ct. at 532 (citing In re Grove).

The rule announced in *Reynolds, supra,* is also applicable to confidential communications of a President pertaining to the conduct of the 'Office of the President. This privilege is identical [112] to the privilege which protects all executive department "documents reflecting advisory opinions, recommendations and deliberations com-

prising part of a process by which governmental decisions and policies are formulated." *Carl Zeiss, supra,* 40 F.R.D. at 324. *See also,* Black v. Sheraton Corp. of America, et al., 371 F.Supp. 97, 100 (D.D.C.1974); United States v. Article of Drug, etc., 43 F.R.D. 181, 190 (D.Del.1967); Rosee v. Board of Trade of City of Chicago, 36 F.R.D. 684, 689 (N.D.Ill.1965); United States v. Procter & Gamble Co., 25 F.R.D. 485, 489 (D.N.J.1960); Kaiser Aluminum & Chemical Corp. v. United States, 157 F.Supp. 939, 944, 141 Ct.Cl. 38 (1958); Gardner v. Anderson, 9 Fed.Cas. p. 1158, No. 5220 (C.C.D.Md. 1876). In these cases, while the fact of the communication is privileged, as with all privileges,[113] the substance of the communication has not been separated from the fact thereof; "While it is agreed that the privilege extends to all military and diplomatic secrets, its recognition is not confined to data qualifying as such." *Carl Zeiss, supra,* 40 F. R.D. at 324. Therefore, the courts in such cases have uniformly adopted the "head of the department" principle, requiring the head of the department to assess the impact of disclosure, not only on the free flow of information, but the impact of the substance of the disclosure upon ongoing governmental interests. *See, e. g., Carl Zeiss, supra,* 324 n. 15 (citing numerous cases where the courts have noted the impact of the substance

111. Notably, the Department of the Navy originally had broadly asserted a privilege in the trial court but that court postponed the matter "to learn further from the Navy Department what its position in the matter really was", after which the Secretary of the Navy gave the court a different reply, "qualifying in a very material respect the answer [the Department] had previously given to the court's request for copies of the papers." 180 F. at 70.

112. It is arguable that the Supreme Court in United States v. Nixon, *supra,* did not bifurcate the privilege which protects confidential communications to the Chief Executive and that which is afforded to the executive departments and agencies, since the court cited in support of the privilege such cases as *Carl Zeiss, supra,* which involved only execu-

tive departments and not the Office of the President. This conclusion is further supported when it is considered that the executive departments and agencies are merely extensions of the Office of the Chief Executive, which aid in the performance of Article II powers, U.S.Const., Art. II, Sec. 2. And, therefore, the Supreme Court's decision in United States v. Nixon may be considered nothing more than a determination that the heretofore common law privilege which has protected confidential communications in the Executive Branch is constitutionally based. 418 U.S. at 704–710, 94 S.Ct. at 3106–3109.

113. The fact of the communication and the substance thereof may not be so easily separated. *See* Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972).

of the communication as well as the fact of the communication). Thus, since the fact of the communication can similarly not be separated from the substance thereof with respect to the communications of the President pertaining to the conduct of the Office of the President,[114] the head of the department rule of *Reynolds* must be applied.[115]

That the rule in *Reynolds, supra,* must be applied with respect to confidential communications of the President relating to the conduct of the Office of the President is even more compelling than with respect to the executive departments, since the former relate to decisions and policies at the highest level of the government. Thus, the disclosure of even the most innocuous statement about a foreign power, for example, may have the gravest repercussions. *See* United States v. Nixon, *supra,* 418 U.S. at 714–716, 94 S.Ct. at 3111.

Thus, the assertion or waiver of the privilege which protects confidential communications relating to the conduct of the Office of the President, even though they are those of a former President, must be exercised by the incumbent President. It may not be asserted or waived by a private party, even a former President; it is apparent that Mr. Nixon, although a former President,

is no longer privy to the myriad of information concerning ongoing governmental interests which would be essential to the exercise of the privilege. Therefore, he lacks the capacity to assert or waive the privilege.[116] Thus, the preservation or disclosure of confidential communications pertaining to the conduct of the Office of the President must devolve upon the incumbent President.

This conclusion would also obtain even if the substance of the communication were not considered. For, the privilege of confidentiality of presidential communications is not only based upon the public interest, but also, it is to be exercised in the public interest.[117] "If a President concludes that compliance with a subpoena would be injurious to the public interest he may . . . invoke a claim of privilege." United States v. Nixon, 418 U.S. at 713, 94 S.Ct. at 3110. Thus, even where the disclosure of the substance of the communication would not be detrimental to ongoing governmental interests, an assessment must be made of whether the public interest in disclosure outweighs the affect upon the free flow of information within the Office of the President. And, only the incumbent President is in a position to assess the public interest, and balance these interests. Clearly, even in such

---

114. Although the Supreme Court in United States v. Nixon stated that case did not involve "the President's interest in preserving state secrets," 418 U.S. at 712, 94 S.Ct. at 3109, n. 19, the Court did not divorce the substance of the communication from the fact of the communication. The Court in fact found that since the President could not give any reason for withholding the information contained in the conversation, the general claim of confidentiality was insufficient to overcome the specific needs of another significant public interest, that of the "fair administration of criminal justice." 418 U.S. at 711–712, 94 S.Ct. at 3109–3110.

115. This rule has in fact been applied to confidential White House communications. Center for Corporate Responsibility v. Shultz, 368 F.Supp. 863 (D.D.C.1973). There, the district court had ordered the production of a tape recorded conversation between President Richard M. Nixon, White

House counsel John W. Dean, III, and Chief of Staff H. R. Haldeman, concerning political influence of the Internal Revenue Service relating to the denial of an application for tax exemption of the Center for Corporate Responsibility. Subsequent to the court's order, White House counsel, noting his general authority in such matters, filed a claim of executive privilege. The court, finding the rule in *Reynolds* applicable, held that since only the President was in a position to assert the privilege, the claim was improperly asserted. 368 F.Supp. at 872–873.

116. This is even more apparent with respect to the heirs of the former President who have never held the office.

117. "[The] application of Executive privilege depends on a weighing of the public interest protected by the privilege against the public interests that would be served by disclosure in a particular case." Nixon v. Sirica, *supra,* 159 U.S.App.D.C. 58, 487 F.2d at 716.

instances, "[the privilege] is not to be lightly invoked." *Reynolds, supra,* 345 U.S. at 7, 73 S.Ct. at 532.

Moreover, it is the incumbent President, not the former President, who bears the legal and political responsibility for either asserting or waiving the privilege. It is the incumbent President who is held legally responsible for his conduct, U.S.Const. Art. II, Sec. IV, and it is the incumbent President who is held politically responsible; he, not the former President, must stand for re-election, U.S.Const., Art. II, Sec. I, cl. 1. And, even though there are statutes which would prohibit the former President from disclosing certain information,[118] these statutes are not all-inclusive.

The court concludes that the privilege which protects confidential communications relating to the conduct of the Office of the President belongs to the government, and must be asserted or waived by the incumbent President, and not by the former President or any other private citizen.

C. *The Scope of Protection of the Privilege*

Former President Nixon contends that if he is unable to control the assertion or waiver of the privilege, he will lose the protection that the privilege would afford him if he were still in office.

Preliminarily, as this Court has earlier set forth, the privilege does not exist for the protection of the officeholder, but rather for the office and, therefore, the public. Yet, the effect of the privilege is to shield public officials to a limited extent. They are protected from public disclosure of "errors or bad judgment," *Kaiser Aluminum, supra,* 157 F. Supp. at 946, except where the privilege must yield to other interests. *See* United States v. Nixon, *supra*. However, this protection is limited:

"It is true, of course, that the Executive cannot, any more than the other branches of government, invoke a gen-eral confidentiality privilege to shield its officials and employees from investigations by the proper governmental institutions into possible criminal wrongdoing."

Senate Select Comm. on Pres. Cam. Act. v. Nixon, *supra,* D.C.Cir., 498 F.2d at 731 (footnote omitted).

*See also,* Nixon v. Sirica, *supra,* 159 U. S.App.D.C. 58, 487 F.2d at 713.

 It is against this background that former President Nixon strongly asserts that if the court rules that only an incumbent President may assert or waive the privilege which protects the confidential communication of the President, including those of a former President, relating to the conduct of the Office of the President, it would subject each President to the intolerable possibility that his successor would lay bare, either out of spite or for political gain, those confidential communications of his predecessor which reveal "errors or bad judgment." But such an assertion is untenable as the privilege is part of the Constitution, United States v. Nixon, *supra,* which each President has a constitutional duty to "preserve, protect and defend." U.S.Const., Art. II, Sec. I, cl. 7. This duty carries with it the responsibility that each President not disclose the confidential communications of his predecessor except upon the same consideration that he is required to give to his own confidential communications with his assistants, i. e., when it is in the "public interest". United States v. Nixon, *supra,* 418 U.S. at 713, 94 S.Ct. at 3110 (Section D). And, it matters not that a former President has no remedy at law or equity to prohibit disclosures by his successors, or to recover damages therefrom for his successors, having taken the "oath of office" may, upon a violation of the duty to protect such communications, be held responsible. U.S.Const., Art. II, Sec. I, cl. 1; Sec. IV.

Former President Nixon, however, claims that a "Presidential privilege" is essential to a former President; other-

---

118. *See e. g.,* title 18 U.S.C. § 793(d)–(e).

wise, he could be compelled to reveal confidential communications once he had left office.[119] This Court has rejected any notion of a *personal* "Presidential privilege". However, this does not mean that a President, once he has left office, can be compelled to reveal confidential communications which relate to the conduct of the Office of the President. For, a President, in this sense, is analogous to an attorney.

 When an attorney is subpoenaed or summoned to testify about confidential communications protected by the attorney-client privilege, he may not do so without the informed consent of his client. For, the attorney-client privilege is personal to the client, and can only be waived by the client. *See* Magida v. Continental Can Co., 12 F.R.D. 74, 78 (S.D.N.Y.1951). Similarly, the former President, when called upon to testify about confidential communications concerning the conduct of the Office of the President, could not do so without the informed consent of the client— in this case, the public. However, unlike the attorney-client privilege, the public expresses its consent through its designated representative,[120] the incumbent President. Thus, it would appear that when the former President is subpoenaed or summoned to testify concerning confidential communications relating to the conduct of the Office of the President, the incumbent President would have to intercede in order to assert or waive the privilege. This conclusion has found expression in not wholly dissimilar cases. *See e. g.,* Heine v. Raus, 399 F.2d 785 (4th Cir. 1968). However, a final and conclusive determination of this question is not essential for a resolution of the questions herein.

The Court concludes, as a matter of law, that the privilege which attaches to confidential communications relating to the conduct of the Office of the President contained in Presidential materials and tape recordings belongs to the government and may only be asserted or waived by the incumbent President, and not by former President Nixon.

## X. FOURTH AMENDMENT

POINT ONE: MR. NIXON'S FOURTH AMENDMENT RIGHTS HAVE NOT BEEN VIOLATED BECAUSE THE NOVEMBER 9TH AGREEMENT IS NOT A GENERAL WARRANT: NOR DOES IT SUBJECT HIM TO AN UNREASONABLE SEARCH AND SEIZURE. HOWEVER, UNDER THE CIRCUMSTANCES, MR. NIXON'S RIGHT OF PRIVACY MUST BE AFFORDED PROTECTION.

This Court, having held that only the incumbent President can assert or waive the privilege which attaches to the confidential communications relating to the conduct of the Office of the President contained in the Presidential materials and taped conversations of the Nixon Administration, cannot enjoin the actions of the defendants or the November 9th Agreement on the basis of a claim of infringement of "Presidential privilege". Mr. Nixon, however, also seeks to enjoin the defendants, who are now acting pursuant to the November 9th Agreement, from infringing upon his alleged fourth amendment rights. In a three-fold allegation, he claims that the November 9th Agreement is a "general warrant", that the defendants' access to the Presidential materials and tape recordings is a violation of his right to be free from unreasonable searches and sei-

---

119. In support of this contention, he points to the fact that Harry S. Truman, after he had left office, when summoned to testify before Congress, refused on the ground that he could not do so as it would result in his revealing confidential communications relating to the conduct of the office of the President and, the communications were, there-

fore, privileged. Brief of Richard M. Nixon in Support of Motion for Preliminary Injunction at 26.

120. *Cf.* In re Investigation of World Arrangements with Relation to . . . Petroleum, 13 F.R.D. 280, 285–286 (D.D.C. 1952).

zures, and that the defendants will also violate his constitutional right of privacy. The Court will deal with each of these arguments in turn, as they are in large part dependent upon each other.

## A. *"General Warrant"*

■ Mr. Nixon contends that the November 9th Agreement is a "general warrant" which is abhorrent to the Constitution, specifically the fourth amendment which was adopted to safeguard against such pernicious practices. *See* Weeks v. United States, 232 U.S. 383, 390, 34 S.Ct. 341, 58 L.Ed. 652 (1914). The November 9th Agreement, set forth in its entirety in Appendix B, however, bears no resemblance to a "general warrant". It does not give the Special Prosecutor the general authority to invade the home and privacy of a citizen and seize his private papers in support of charges against him. *Id.* It is evident from the first paragraph of the agreement that it is a waiver by the incumbent President of the privilege to prevent disclosure of confidential communications between the President, albeit the former President, and his assistants relating to the conduct of the Office of the President:

> "WHEREAS, Gerald R. Ford, President of the United States, has determined and informed his counsel that the due administration of justice and the public interest require that the Special Prosecutor have prompt and effective use of those Presidential materials of the Nixon Administration now located in the White House complex that are relevant and important to ongoing criminal investigations and prosecutions within the Special Prosecutor's jurisdiction . . ." [121]

The agreement does not give the Special Prosecutor the power to indiscriminately search the Presidential materials and tape-recorded conversations. Rather, it specifically limits both the scope and procedures for access. The Special Prosecutor not only must specify "those materials that he has reason to believe are relevant to specified criminal investigations and prosecutions" but also must explain "why access to such materials is important to a full and fair resolution of these investigations and prosecutions." [122]

More importantly, the agreement does not sanction an unlawful intrusion into the privacy of a citizen. Although the agreement does not define the "Presidential materials" referred to in the first paragraph, the United States government and the Special Prosecutor have stated on the record that it only encompasses Presidential materials and tape recordings relating to the conduct of the office of the President. They argue that such access is lawful and is based upon the government's right to access to materials and tape-recorded conversations in which they have an "overriding interest". This theory is extracted from dicta in the case of Folsom v. Marsh, 9 Fed.Cas. 342, 347 (D.Mass.1841) and a recent opinion of the Attorney General.[123] Although this Court has rejected this theory, the access is nevertheless lawful, since this Court has held that these "Presidential material and tapes" do in fact belong to the government, giving it an unfettered right of access.

Thus, there being no grounds for concluding that the November 9th Agreement is a "general warrant", its effectuation can not be enjoined on that basis.

## B. *Search and Seizure*

■ Mr. Nixon's second contention is that any search by the defendants pursuant to the November 9th Agree-

---

121. The striking similarity of this language with that of the Supreme Court, in United States v. Nixon, 418 U.S. at 712, 94 S.Ct. at 3110, is quite evident. And, it must also be pointed out that President Ford, although waiving the general privilege as to confiden-

tiality, did not waive the privilege as to national security matters. *See* Appendix B, ¶ 2.

122. Appendix B, ¶ 1 and 1(a) & (b).

123. *See* footnote 88, *supra.*

ment would nevertheless violate his fourth amendment right to be free from unlawful searches and seizures. This claim must be considered in light of the following: first, the defendants and the Special Prosecutor have averred that the November 9th Agreement only pertains to Presidential materials and tape-recorded conversations relating to the conduct of the Office of the President; second, this Court has held that these are the property of the United States Government; and, third, they are in the possession of the Executive Branch of the government.

 There is no cognizable fourth amendment claim by a private citizen with respect to a search by the government of government property in the government's possession, even though the private citizen generated or retained the property as a public official.[124] This is true even though the fourth amendment applies to private materials, Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), and private conversations, United States v. United States Dist. Ct., E. D. of Mich., S. D., 407 U.S. 297, 313, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972), and not to government-owned materials and tape-recorded conversations. *Cf.* Davis v. United States, 328 U.S. 582, 589–591, 66

S.Ct. 1256, 1259, 90 L.Ed. 1453 (1945). And, even where the individual is still in public office, it is well-settled that, "in the case of public records and official documents, made or kept in the administration of public office, the fact of actual possession or of lawful custody would not justify the officer in resisting inspection, even though the record was made by himself and would supply the evidence of his alleged criminal dereliction." Wilson v. United States, 221 U.S. 361, 380, 31 S.Ct. 538, 55 L.Ed. 771 (1912). *See also* Taylor v. United States, 111 U.S.App.D.C. 324, 296 F.2d 446 (1961). This principle has even greater force when the official has left office and no longer is in custody of the materials, for "the settled doctrine is that objection to evidence obtained in violation of the prohibition of [the fourth amendment] may be raised only by one who claims ownership in or right to possession of . . . the property seized . . . ." Gibson v. United States, 80 U.S.App.D.C. 81, 149 F.2d 381, 384 (1945).[125]

It is the conclusion of this Court that there can be no violation of Mr. Nixon's fourth amendment right to be free from unlawful searches and seizures with respect to the Presidential materials and tape-recorded conversations relating to

---

124. The fourth amendment protects an individual from unlawful government seizures of private property in the individual's possession; it does not protect seizures of private property lawfully in the possession of the government. *See* Burdeau v. McDowell, 256 U.S. 465, 476, 41 S.Ct. 574, 65 L.Ed. 1048 (1921). Thus, it is difficult to comprehend how there could be any unlawful search and seizure of government property in government possession. The applicable constitutional provision would appear to be the fifth amendment, which protects an individual from compulsory production of evidence to be used against him. *See* United States v. Davis, *supra*, 328 U.S. at 587, 66 S.Ct. 1256. There is no indication, however, that the Special Prosecutor intends to use the Presidential materials and tape-recorded conversations in a criminal proceeding against the former President. And, the Court takes judicial notice of the fact that President Ford has granted, and Mr. Nixon has accepted, a

full and unconditional pardon. Such a pardon dispels any possibility that a fifth amendment claim could be cognizable. Brown v. Walker, 161 U.S. 591, 598–599, 16 S.Ct. 644, 40 L.Ed. 819 (1896). However, since Mr. Nixon has not contested the November 9th Agreement on fifth amendment grounds, it is unnecessary for the Court to embark upon consideration of such issues.

125. Although the Supreme Court has held that property rights and the right to possession are not controlling fourth amendment considerations, Warden v. Hayden, 387 U.S. 294, 302–306, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), they become significant in the instant matter which is analogous to the situation where one citizen seeks to prevent the search of another citizen's property. *See* Gibson, *supra*, 149 F.2d at 384. In such situations, there is no cognizable fourth amendment claim. *Id.*

the conduct of the Office of the President, which are owned by and are in the possession of the United States Government.

### C. *Right of Privacy*

Having rejected Mr. Nixon's general warrant and search and seizure allegations, the Court will now address the merits of his allegation of infringement of his right of privacy.

■■■ The essential purpose of the fourth amendment is to shield the citizen from unwarranted intrusions into his privacy. Cardwell v. Lewis, 417 U.S. 583, 94 S.Ct. 2464, 2469, 41 L.Ed.2d 325 (1974) (and cases cited therein). "This protection reaches all alike, whether accused of a crime or not, and the duty of giving to it force and effect is obligatory upon all entrusted under our Federal system with the enforcement of the laws." Weeks v. United States, 232 U.S. 383, 392, 34 S.Ct. 341, 344, 58 L.Ed. 652 (1914). Thus, even though Mr. Nixon is not the object of the criminal process, he has a right to have the privacy of both his private papers and conversations protected. But, such protection is not afforded unless it can be found that he has a reasonable expectation that they will remain free from governmental intrusion. *See* Mancusi v. DeForte, 392 U.S. 364, 88 S.Ct. 2120, 20 L.Ed.2d 1154 (1968); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967).[126]

■■■ The fact that personal property is in the possession of the government does not in and of itself eliminate an expectation of privacy. *See* United States v. Blok, 88 U.S.App.D.C. 326, 188 F.2d 1019, 1021 (1951). Here, former President Nixon left office under unique circumstances, making it difficult for him to remove with him his personal materials and tape-recorded conversations. The evidence indicates that at the time of his departure, they were being prepared for transfer to his home in California. Certainly, the fact of his unusual departure from office did not diminish his nor the government's expectation that these materials would remain free from intrusion. Thus, his right of privacy deserves protection.

However, the need to protect Mr. Nixon's right of privacy with respect to personal materials and tape-recorded conversations springs not from an intended governmental intrusion, but from the circumstances and the very nature of the tapes. The Special Prosecutor and the government defendants have emphatically stated that they have no interest in Mr. Nixon's personal materials and tape-recorded conversations. They admit, however, that in locating certain government-owned materials and tape-recorded conversations, specified by the Special Prosecutor pursuant to the November 9th Agreement, there may be inadvertent examination of the private materials and tape-recorded conversations. This is due to the fact, recognized by all the parties, that official and personal materials and conversations are intermingled. This is supported by the evidence adduced at the hearings which revealed that in the haste to compile and prepare the materials for transfer, no system for separating personal from official materials was employed.[127] And, although some of the boxes in which the material was placed are marked, there is no assurance as to the nature of all of the materials in a particular box or file.[128] With respect to the tape-recorded conversations, it is obvious and uncon-

126. Although it is arguable that the Presidential Recordings and Materials Preservation Act, *supra*, may have taken by eminent domain these private materials and tape-recorded conversations, this is still in dispute and is the subject matter of Mr. Nixon's newly-filed suit. *See* footnote 64, *supra*. Thus, the Court will not reject Mr. Nixon's privacy claim on that basis. Further, a strong argument may be made that the Act in fact protects his right of privacy. *See* section 104(a).

127. Testimony of Mr. Jack Nesbitt, TR–82–83, 86–94, 104–105; *See also*, Deposition of Mr. Nesbitt at 10–11, 27, 38–40, 65, 38–42.

128. *Id.*

tested that they are interspersed with official and personal matters.

The Court, therefore, finds that Mr. Nixon does have a cognizable right of privacy claim to the personal materials and tape-recorded conversations which right is threatened not by an intended governmental intrusion, but by the possibility of inadvertent examination in the course of the defendants' lawful examination of Presidential materials and tape-recorded conversations relating to the conduct of the Office of the President. Having so found, the Court turns to the question of the nature of the remedy to be applied under the circumstances.

POINT TWO: MR. NIXON'S RIGHT TO PRIVACY DOES NOT ENTITLE HIM TO AN INJUNCTION, BUT THE COURT HAS THE POWER TO PROTECT HIS RIGHTS AND THOSE OF THE GOVERNMENT BY FASHIONING A REMEDY.

 This Court has the power to issue an injunction to prevent an injury to a constitutionally-protected right, in this case, the right of privacy. *See,* Bell v. Hood, 327 U.S. 678, 66 S.Ct. 773, 90 L.Ed. 939 (1946)[129] *see also* Bivens v. Six Unknown Named Agents of the Fed. Bur. Narc., 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (especially Harlan, Jr., concurring, 398–412). Such a remedy, however, is in this instance clearly inappropriate. The Special Prosecutor and the government defendants have, as previously noted, evinced no interest in Mr. Nixon's personal materials and tape-recorded conversations. This Court will not enjoin them from doing an act which they do not themselves wish to do. Nevertheless, the Special Prosecutor and the government, having candidly conceded that as a result of intermingling the possibility of unintend-

ed infraction exists, have recommended that the Court fashion a remedy suited to the circumstances. It is clear that this Court has the power, and indeed the duty, to fashion such a remedy. *See* Marbury v. Madison, 5 U.S. (1 Cranch) 137, 163, 2 L.Ed. 60 (1803):

> "the government of the United States has been emphatically termed a government of laws, and not of men. It will certainly cease to deserve this high appellation, if the laws furnish no remedy for the violation of a vested legal right."

*See also, Bivens, supra;* J. I. Case Co. v. Borak, 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964); Textile Workers Union v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957); Bell v. Hood, *supra;* Dellinger, Of Rights and Remedies: The Constitution as a Sword, 85 Harv.L.Rev. 1532, 1540–43 (1971–72).

In light of the circumstances, the problem facing the Court is formulating a procedure which will both effectuate the interests and protect the rights of the parties. This is not a novel problem, even with respect to these very same tape-recorded conversations. *See* Nixon v. Sirica, *supra,* 159 U.S.App.D.C. 58, 487 F.2d at 718–721.

Although the overall controversy concerns approximately 42 million materials, including documents, papers, tapes, etc., the Special Prosecutor, the government, and Mr. Nixon agree that their dispute involves a significantly smaller number of items. These include approximately 138 boxes of papers and 900 tape-recorded conversations. Further, the Special Prosecutor, pursuant to the November 9th Agreement, seeks only a relatively small portion of these materials to be used for investigations, for ongoing grand injuries, and for prosecutions. And, in an effort to aid the Court, the Special Prosecutor has sug-

---

129. The Court, articulating the rule, stated " . . . it is established practice for this Court to sustain the jurisdiction of federal courts to issue injunctions to protect rights safeguarded by the Constitution . . . ". 327 U.S. at 684, 66 S.Ct. at 777 (footnote omitted).

gested several alternative procedures for resolving the question of access.[130]

■ Initially, it must be recognized that Mr. Nixon, not the government or Special Prosecutor, must make the preliminary determination of what is private. For if the government or Special Prosecutor were to examine the materials and tape-recorded conversations for this purpose, they would be doing that which any procedure must be designed to prevent—the intrusion into Mr. Nixon's privacy. Allowing Mr. Nixon to make this initial determination, however, must not result in the frustration of the interests of the government in immediate and unfettered access to materials and tape-recorded conversations relating to the conduct of the Office of the President. Therefore, the Court, based upon the recommendations of the Special Prosecutor, will require the following procedure: [131]

1. *Documents:* In effectuating the terms and conditions of the November 9th Agreement, the government defendants, or their agents, prior to any governmental examination of the materials, shall permit Mr. Nixon or his counsel, (a) to segregate from any box or file, any document which is deemed personal, as defined by this Court, (b) to mark those portions of any document which are deemed private, as defined by this Court, without destroying or impairing the integrity of that portion or any other portion of the document;

2. *Tapes:* In effectuating the terms and conditions of the November 9th Agreement, the government defendants, or their agents, prior to any governmental examination of the tape-recorded conversations, shall permit Mr. Nixon or his counsel to listen to those tape-recorded conversations and, if any such tape-recorded conversation contains matters which are deemed private, as defined by this Court, then Mr. Nixon or his counsel shall so designate.

This procedure is to be effectuated as follows:

(a) The defendants shall specify one individual official of the government having expertise in the use of tape recording mechanisms (hereinafter, "operator"), who at all times shall operate the mechanisms chosen by the operator for use in this procedure; and

(b) The operator shall employ two tape recorders, one (hereinafter, "recorder A") of which shall include the following features: (1) a single-listening device, commonly known as headphones, and (2) a digital "counter"; the other (hereinafter, "recorder B") shall include the capacity to duplicate the recording from recorder A; and

(c) When Mr. Nixon, or his counsel, are in the process of listening to the tapes, he shall utilize the single-listener device; and

(d) The operator shall play the tape on recorder A and duplicate the tape onto recorder B, and when Mr. Nixon or his counsel deem any conversation or portion thereof as private, as defined by this Court, the operator shall stop recorder B at the commencement of that conversation or portion thereof so as not to record that conversation or portion thereof on the tape on recorder B, and shall commence the tape on recorder B at the termination of the conversation or portion thereof designated as private,

130. Response of the Special Prosecutor to Mr. Nixon's Report to the Court, January 2, 1975.

131. This procedure is delineated in terms of the effectuation of the November 9th Agreement. However, the same procedure is intended to apply with equal force to requests for Presidential materials or tape-recorded conversations when such requests are made pursuant to a subpoena or court order, or

by way of application under the Freedom of Information Act. As discussed in Section VIII, *supra,* requests under the FOIA are proper when the materials or conversations being sought were generated by executive departments or by the Executive Office of the President; requests are not within the scope of the FOIA when the materials or conversations being sought were generated by the White House Office.

and the operator shall also, utilizing the "counter", mark in a log the digital number of the commencement and termination of the conversation or portion thereof designated as private.

Thus, there will be produced one duplicate for use without any private conversations or portions thereof. And, if the original tape or tapes are to be used, the private conversations or portions thereof can be avoided by reference to the log and the digital numbers therein.

The Court is of the belief that the above procedure will be accomplished with the full cooperation of the parties and with all deliberate speed.

It is recognized by all parties that disputes will arise with respect to the validity of the claim that a particular material or tape-recorded conversation, or portion thereof, is private. When such a dispute arises, upon notice of counsel, the Court shall examine the material or tape-recorded conversation, or portion thereof, *in camera*. This shall be followed by a hearing in chambers under the procedure set forth below.

The burden of proof as to whether a particular paper or tape-recorded conversation, or portion thereof, is personal shall be borne by Mr. Nixon. The primary reason for placing the burden of proof on Mr. Nixon is that he alone will have "access to knowledge about the fact in question." James, Civil Procedure, 257 (1965) (citing Maguire, Evidence, Common Sense and Common Law 179 (1947)). The government and the Special Prosecutor are at an obvious disadvantage since they will not have examined the materials or tape-recorded conversations, and, therefore, will not be able to say with sufficient accuracy why a particular paper or tape-recorded conversation, or portion thereof, is or is not private or official. Thus, the burden must fall to the party having the superior knowledge of the facts in question.

Placing the burden on Mr. Nixon also comports with the traditional reason for allocating the burden of proof. The government and the Special Prosecutor

do not seek access to these private materials and tape-recorded conversations. Rather, it is Mr. Nixon as plaintiff who seeks to protect his privacy therein. Thus, the burden of proof must be placed upon Mr. Nixon, who relies upon the essential fact that a particular paper or tape-recorded conversation or portion thereof is private to establish his claim for relief. *See* 9 Wigmore, Evidence § 2486 (3d ed. 1940).

Furthermore, the Court will not require that the government or Special Prosecutor demonstrate a particular need for a particular paper or tape-recorded conversation prior to the *in camera* inspection. Although this is contrary to the procedure set forth in Nixon v. Sirica, supra, 159 U.S.App.D.C. 58, 487 F.2d at 716–718, and approved in United States v. Nixon, 418 U.S. at 712–716, 94 S.Ct. at 3110–3111, there are obvious reasons for not adopting that requirement in the instant matter. There the taped conversations were cloaked in a "presumptive privilege", since their production was opposed on the basis of executive privilege. 487 F.2d at 716; 418 U.S. at 708, 94 S.Ct. at 3108. The presumption was based upon a deference to a determination of a co-equal branch of the government and upon the great public interest in nondisclosure. 487 F. 2d at 717; 418 U.S. at 706–707, 94 S.Ct. at 3107, 3111. These considerations are not extant where the sole reason for opposing mere inadvertent examination is the personal right of privacy.

Thus, the Court will require that when a dispute arises, Mr. Nixon shall submit to the Court, the government, and the Special Prosecutor, a specific statement designating with particularity those materials or tape-recorded conversations, or portions thereof, which he believes should not be examined. This shall be accompanied by a detailed statement of the reasons why the particular materials or tape-recorded conversations are to be considered private. Such statement shall be drawn in such a manner so as not to compromise the substance of the materials or conversations

for which protection is sought. Whereupon the government and the Special Prosecutor shall file with the Court and Mr. Nixon a response thereto, with that degree of specificity as is possible using available materials.[132] Those materials and/or tape-recorded conversations shall be submitted to the Court for an *in camera* inspection, to be followed by a hearing in chambers.

Following the *in camera* inspection and the hearing in chambers, the Court will either (a) uphold or deny the claim, or (b) uphold or deny the claim in part, and thereupon designate that which is private. These findings shall be considered final for purposes of appeal.

## XI. CONCLUSION

In accordance with this Opinion, and the findings of fact and conclusions of law contained herein, the Court will issue an Order of even date herewith rendering judgment which grants or denies total or partial relief to the parties based upon their claims.

## APPENDIX A

September 6, 1974

Honorable Arthur F. Sampson
Administrator
General Services Administration
Washington, D.C.

Dear Mr. Sampson:

In keeping with the tradition established by other former Presidents, it is my desire to donate to the United States, at a future date, a substantial portion of my Presidential materials which are of historical value to our Country. In donating these Presidential materials to the United States, it will be my desire that they be made available, with appropriate restrictions for research and study.

In the interim, so that my materials may be preserved, I offer to transfer to the Administrator of General Services (the "Administrator"), for deposit, pursuant to 44 U.S.C. Section 2101, et seq.,

all of my Presidential historical materials as defined in 44 U.S.C. Section 2101 (hereinafter "Materials"), which are located within the metropolitan area of the District of Columbia subject to the following:

1. The Administrator agrees to accept solely for the purpose of deposit the transfer of the Materials, and in so accepting the Materials agrees to abide by each of the terms and conditions contained herein.

2. In the event of my death prior to the expiration of the three-year time period established in paragraph 7A hereof, the terms and conditions contained herein shall be binding upon and inure to the benefit of the executor of my estate for the duration of said period.

3. I retain all legal and equitable title to the Materials, including all literary property rights.

4. The Materials shall, upon acceptance of this offer by the Administrator, be deposited temporarily in an existing facility belonging to the United States, located within the State of California near my present residence. The Materials shall remain deposited in the temporary California facility until such time as there may be established, with my approval, a permanent Presidential archival depository as provided for in 44 U.S.C. Section 2108.

5. The Administrator shall provide in such temporary depository and in any permanent Presidential archival depository reasonable office space for my personal use in accordance with 44 U.S.C. Section 2108(f). The Materials in their entirety shall be deposited within such office space in the manner described in paragraph 6 hereof.

---

132. These include materials such as White House diaries, logs, indices, etc., that the Special Prosecutor has said are available for this use.

6. Within both the temporary and any permanent Presidential archival depository, all of the Materials shall be placed within secure storage areas to which access can be gained only by use of two keys. One key, essential for access, shall be given to me alone as custodian of the Materials. The other key may be duplicated and entrusted by you to the Archivist of the United States or to members of his staff.

7. Access to the Materials within the secure areas, with the exception of recordings of conversations in the White House and the Executive Office Building which are governed by paragraphs 8 and 9 hereof, shall be as follows:

A. For a period of three years from the date of this instrument, I agree not to withdraw from deposit any originals of the Materials, except as provided in subparagraph B below and paragraph 10 herein. During said three-year period, I may make reproductions of any of the originals of the Materials and withdraw from deposit such reproductions for any use I may deem appropriate. Except as provided in subparagraph B below, access to the Materials shall be limited to myself, and to such persons as I may authorize from time to time in writing, the scope of such access to be set forth by me in each said written authorization. Any request for access to the Materials made to the Administrator, the Archivist of the United States or any member of their staffs shall be referred to me. After three years I shall have the right to withdraw from deposit without formality any or all of the Materials to which this paragraph applies and to retain such withdrawn Materials for any purpose or use I may deem appropriate, including but not limited to reproduction, examination, publication or display by myself or by anyone else I may approve.

B. In the event that production of the Materials or any portion thereof is demanded by a subpoena or other order directed to any official or employee of the United States, the recipient of the subpoena or order shall immediately notify me so that I may respond thereto, as the owner and custodian of the Materials, with sole right and power of access thereto and, if appropriate, assert any privilege or defense I may have. Prior to any such production, I shall inform the United States so it may inspect the subpoenaed materials and determine whether to object to its production on grounds of national security or any other privilege.

8. The tape recordings of conversations in the White House and Executive Office Building which will be deposited pursuant to this instrument shall remain on deposit until September 1, 1979. I intend to and do hereby donate to the United States, such gift to be effective September 1, 1979, all of the tape recordings of conversations in the White House and Executive Office Building conditioned however on my continuing right or access as specified in paragraph 9 hereof and on the further condition that such tapes shall be destroyed at the time of my death or on September 1, 1984, whichever event shall first occur. Subsequent to September 1, 1979 the Administrator shall destroy such tapes as I may direct. I impose this restriction as other Presidents have before me to guard against the possibility of the tapes being used to injure, embarrass, or harass any person and properly to safeguard the interests of the United States.

9. Access to recordings of conversations in the White House and Executive Office Building within the secure areas shall be restricted as follows:

A. I agree not to withdraw from deposit any originals of the Materials, except as provided in subparagraph B and paragraph 10 below, and no reproductions shall be made unless there is mutual agreement. Access to the tapes shall be limited to myself, and to such persons as I may authorize from time to time in writing, the scope of such access to be set forth by me in each said written authorization. No person may listen to such tapes without my written prior approval. I reserve to myself such literary use of the Information on the tapes.

B. In the event that production of the Materials or any portion thereof is demanded by a subpoena or other order directed to any official or employee of the United States, the recipient of the subpoena or order shall immediately notify me so that I may respond thereto, as the owner and custodian of the Materials, with sole right and power of access thereto and, if appropriate, assert any privilege or defense I may have. Prior to any such production, I shall inform the United States so it may inspect the subpoenaed materials and determine whether to object to its production on grounds of national security or any other privilege.

10. The Administrator shall arrange and be responsible for the reasonable protection of the Materials from loss, destruction or access by unauthorized persons, and may upon receipt of any appropriate written authorization from the Counsel to the President provide for a temporary re-deposit of certain of the Materials to a location other than the existing facility described in paragraph 4 herein, provided however that no dimunition of the Administrator's responsibility to protect and secure the Materials from loss, destruction, unauthorized copying or access by unauthorized persons is affected by said temporary re-deposit.

11. From time to time as I deem appropriate, I intend to donate to the United States certain portions of the Materials deposited with the Administrator pursuant to this agreement, such donations to be accompanied by appropri restrictions as authorized by 44 U.S.C. Section 2107. However, prior to such donation, it will be necessary to review the Materials to determine which of them should be subject to restriction, and the nature of the restrictions to be imposed. This review will require a meticulous, thorough, time-consuming analysis. If necessary to fulfill this task, I will request that you designate certain members of the Archivist's staff to assist in this review under my direction.

If you determine that the terms and conditions set forth above are acceptable for the purpose of governing the establishment and maintenance of a depository of the Materials pursuant to 44 U.S.C. Section 2101 and for accepting the irrevocable gift of recordings of conversations after the specified five year period for purposes as contained in paragraph 8 herein, please indicate your acceptance by signing the enclosed copy of this letter and returning it to me. Upon your acceptance we both shall be bound by the terms of this agreement.

Sincerely,

/s/ Richard Nixon

Accepted by: Arthur F. Sampson
Administrator General
Services Administration
/s/ Arthur F. Sampson
9/7/74

## APPENDIX B

## NOVEMBER 9, 1974 AGREEMENT

WHEREAS, Gerald R. Ford, President of the United States has determined and informed his Counsel that the due administration of justice and the public interest require that the Special Prosecutor have prompt and effective use of those Presidential materials of the Nixon Administration now located in the White House complex that are relevant and important to ongoing criminal investigations and prosecutions within the Special Prosecutor's jurisdiction; and

WHEREAS, this Agreement, if implemented, would accommodate the needs of the Special Prosecutor with respect to such materials;

NOW, THEREFORE, the undersigned have agreed as follows:

1. Upon letters from the Special Prosecutor to Counsel to the President specifying those materials that he has reason to believe are relevant to specified criminal investigations or prosecutions within the Special Prosecutor's jurisdiction and explaining why access to such materials is important to a full and fair resolution of those investigations and prosecutions, the Special Prosecutor or his designees shall be afforded access to the materials under the following procedures:

a. *Documents*

1. Where files are organized by subject matter, only those files may be examined which, because of their titles, may contain documents relevant to these specified investigations and prosecutions.

2. Where files are organized chronologically, only that portion of the file covering the time period relevant to the request may be examined.

3. Where no chronological or subject label is on a file, the file may be examined to determine whether the file contains relevant materials.

4. In order to assist in these searches, the Special Prosecutor may request the assistance of members of the archival staff assigned to the White House in making a list of file titles or other index.

b. *Tape Recordings*: Only the tape recordings of conversations specified by letters according to the above procedures may be listened to.

2. The Special Prosecutor shall be allowed to make copies of only those tapes of conversations and documents that he determines are relevant to criminal investigations or prosecutions within his jurisdiction. Prior to the Special Prosecutor receiving such copies, Counsel to the President may review the copies to determine whether they may not be disclosed for reasons of national security. The originals of any tapes and documents, copies of which are provided to the Special Prosecutor, shall be retained and, if necessary for a criminal proceeding, will be given to the Special Prosecutor for such proceeding in exchange for the copies.

3. Richard M. Nixon or his attorney or designated agent shall be given notice of, and may be present during, searches pursuant to this Agreement. Also, Mr. Nixon or his attorney or designated agent, shall be afforded access to and/or copies of those tapes of conversation and documents for which the Special Prosecutor is allowed copies. The Counsel to the President also may designate individuals to be present during these searches.

4. No Presidential materials shall be removed to locations in Washington, D. C. other than the White House complex without the approval of the Special Prosecutor and no portions of such materials shall be removed to locations outside of the District of Columbia without an indication from the Special Prosecutor that he has no further need for such portions, except upon court order.

5. The parties to this Agreement shall move jointly to modify, if necessary, the temporary restraining order as now outstanding in Civil Action number 74–1518 and in consolidated cases in the

United States District Court for the District of Columbia to permit implementation of this Agreement.

/s/ Philip W. Buchen Nov. 8, 1974
Philip W. Buchen
Counsel to the President

/s/ Arthur F. Sampson 11/9/74
Arthur F. Sampson
Administrator of General Services

/s/ H. Stuart Knight 11/9/74
H. Stuart Knight
Director, United States Secret Service

/s/ Henry S. Ruth, Jr. Nov. 8, 1974
Henry S. Ruth, Jr.
Special Prosecutor
Watergate Special Prosecution Force